The KROGER COMPANY, SuperX Drug Corp., Malone and Hyde, Inc. and Bell Pharmacal Corp., Plaintiffs,

v.

JOHNSON & JOHNSON and McNeilab, Inc., Defendants.

No. C–1–81–708.

United States District Court, S.D. Ohio, W.D.

Aug. 18, 1983.

L. Clifford Craig, Cincinnati, Ohio, for plaintiffs.

Donald J. Mooney, Jr., Cincinnati, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This matter was tried to the Court on July 11–14, 1983 at which time testimony and evidence were presented. Plaintiffs seek a Declaratory Judgment that their respective products do not infringe upon any rights of defendants or compete unfairly with the Tylenol name and trade dress. In their Counterclaim, defendants seek injunctive relief prohibiting plaintiffs from manufacturing, selling, distributing or advertising products which they allege are confusingly similar to the Tylenol products.[1] In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court does submit herewith its Findings of Fact, Opinion and Conclusions of Law.

### I. Findings of Fact·

(1) Beginning in approximately 1955, defendant McNeilab, Inc. ("McNeil") began selling a non-aspirin analgesic which it marketed under the trade name of "Tylenol." The principal analgesic ingredient of Tylenol is the chemical N-acetyl-p-aminophenol which is commonly known as acetaminophen. Tylenol was originally advertised only to doctors. Its use was recommended for those persons who could not tolerate aspirin but required an effective analgesic remedy. The first Tylenol was a liquid elixir intended for use by children. In 1961, defendant introduced an adult-strength Tylenol in tablet form. In 1975, an "extra strength" Tylenol was introduced in both tablet and capsule form and McNeil began advertising Tylenol directly to consumers.

(2) Tylenol has been a commercial success from its beginning. At the present time, it holds approximately 90% of the acetaminophen market and close to one-third of the analgesic, pain reliever market. (Defs.' Ex. G). It has competed successfully with such well known national brands as Bayer Aspirin, Anacin and Bufferin.[2]

(3) The Tylenol line has always been advertised and sold in distinctive red and white packaging, including milky white plastic bottles and block-style lettering.[3] With the exception of the extra strength tablets, which are packaged in a red box with white printing, all of the Tylenol products bear red-on-white labels. The letter "T" in the word "Tylenol" is always in larger type than the other upper case letters of the brand name. Tylenol is sold in both Regular and Extra Strength white tablets, Extra Strength red and white capsules, and a red, cherry-flavored elixir.

(4) Plaintiff Kroger operates a chain of supermarkets throughout the United States. Plaintiff SuperX, a wholly-owned subsidiary of Kroger, operates a nationwide chain of full-service drugstores. Plaintiff Malone and Hyde distributes over-the-counter pharmaceutical products to stores in the south and southeast, including its own chain of "Hyde Park" retail stores. All three of these plaintiffs sell both national brand and private label acetaminophen products at their retail locations. Plaintiff Bell is the manufacturer of all of the plaintiffs' products at issue herein.

(5) Prior to 1980, the three retail plaintiffs marketed non-aspirin pain relievers without specific brand names. These products were essentially unsuccessful and indeed the products sold by defendant SuperX were withdrawn from the market for a period of time. Each of the plaintiffs re-introduced a non-aspirin pain reliever between 1979 and 1981, identified by specific brand names. Plaintiff Kroger adopted the name "Actenol," plaintiff SuperX Drugs adopted the name "Supernol," and plaintiff Malone and

---

**1.** The traditional posture of the parties is reversed in this case: the accused infringers are the plaintiffs and the owner of the allegedly infringed product is the defendant.

**2.** In the fall of 1982 after the deaths of seven persons who had ingested poisoned Tylenol capsules, the entire line was removed from the market until tamper-resistant containers were developed. The Tylenol line has been returned to the market and has apparently regained most of its market share.

**3.** Color photographs of the Tylenol product line as well as the accused product lines are attached hereto as Appendices A–D.

Hyde adopted the name "Hydenol." These products are packaged as follows:

(a) *Actenol* appears in packages almost identical in color to Tylenol. Where Tylenol is red on white, Actenol is red on white. Where Tylenol is white on red, Actenol is likewise white on red. A minor difference between the extra strength tablets of Tylenol and Actenol is that in the case of Tylenol, the words "extra strength" appear in yellow, whereas for Actenol, they appear in white. The Actenol packages also contain a vertical stripe which is lacking on the Tylenol package. The vertical stripe is red except in the case of the extra strength Actenol, where it is black. The letter "A" in the word "Actenol" is also in larger type than the other upper case letters of the brand name. (See Appendix B).

(b) *Supernol* also utilizes a red-on-white package, with the exception of the extra strength tablets which are packaged in red. The word "Supernol" appears in yellow letters and the words "Extra Strength" are in black. The Extra Strength Supernol capsules package contains a horizontal red stripe near the bottom which is not present in the Tylenol line. The Supernol elixir also has a drawing of two children whereas the Tylenol elixir has only one. Finally, the letter "S" in the word "Supernol" appears in larger type than the other upper case letters of the brand name. (See Appendix C).

(c) *Hydenol* likewise adopted a red-on-white combination. In the case of both Extra Strength Hydenol tablets and capsules, however, the word "Hydenol" is placed on the package at an approximate 45 degree angle. The Extra Strength Hydenol tablets package does not use the white-on-red combination of the other extra strength products. Hydenol elixir contains a drawing of a teddy bear and three children's building blocks. As in the case of the other accused products, the letter "H" is in larger type than the other letters of the product name. (See Appendix D).

All of the plaintiffs' product lines include white tablets, red and white extra strength capsules, and a red-colored cherry-flavored elixir. These products are essentially identical in appearance to the corresponding Tylenol products. The plaintiffs also uniformly utilize milky white plastic bottles.

(6) Plaintiffs' use of the color combination previously adopted by Tylenol was not accidental[4] nor is it an isolated example of such purposeful imitation.[5]

(7) A survey performed by Bruno and Ridgeway Research Associates, Inc., a marketing and advertising research firm, demonstrated the potential for consumer confusion between Tylenol and the three accused products. (Defs.' Ex. T). The survey indicated not only the likelihood of confusion among these brands, but also a belief by substantial numbers of those interviewed that the accused products were manufactured by Tylenol.[6] Although defendants

---

4. The following dialogue occurred during opening statement of counsel for the plaintiffs:
   THE COURT: '... you have selected intentionally the color combination of Tylenol. Is that correct?'
   MR. DOOLEY [Counsel for plaintiffs]: 'That is correct. It is similar. It was definitely intended to be reminiscent...'

5. Plaintiffs have apparently adopted policies whereby their house brands are marketed with the same color scheme and in some instances, in containers with the same shape as nationally advertised brands. See Plaintiffs' Exhibits 1–I, 1–J, 1–L, 1–N, 1–O, 1–P, 1–Q and 1–X.

6. In the survey, consumers were asked to view a shelf of products containing plaintiffs' products as well as other national brand pain relievers for approximately five seconds. Afterwards, they were asked to identify those products which they had seen. Between 17 and 24% of the respondents claimed that they had seen Tylenol, when in fact it was not present on the shelf. The interviewees were then shown the plaintiffs' respective products and asked who they believed made or manufactured that product. Twenty-three percent (23%) of the persons interviewed thought Actenol was manufactured by Tylenol. Forty percent (40%) of those persons interviewed with respect to Supernol and Hydenol likewise believed those products were manufactured by Tylenol. (Defs.' Ex. T, pg. 3).

attacked the methodology of the Bruno survey at trial, we are satisfied that it was conducted in a professional manner and may be considered as probative evidence on the issue of potential confusion.

(8) The trade name "Tylenol" is probably the strongest trademark in the analgesic, pain reliever field including both aspirin and non-aspirin products. It commands approximately one-third of the entire market for such products. The plaintiffs' products identified as Actenol, Supernol and Hydenol are direct competitors of Tylenol in the sense that each is an aspirin-free pain reliever composed of acetaminophen. The trade names of the accused products are similar to Tylenol in that they all have the suffix "nol." The similarity in the packaging of all four product lines has been noted previously. All of the products in question are also marketed through essentially the same channels: supermarkets and drug stores. Defendant Johnson & Johnson also presented evidence that it intends to expand the Tylenol line with additional products bearing that same name.

## II. Opinion

Resolution of the claims of the Complaint and Counterclaim in this case involve Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Section 45 of the Act sets forth the Congressional intent behind the Lanham Act. It provides:

> The intent of this Chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce ... *[and] to protect persons engaged in such commerce against unfair competition* ... (emphasis added). 15 U.S.C. § 1127.

■ Section 43(a) protects against unfair competition in the form of "passing off," which the United States Court of Appeals for the Sixth Circuit has described as follows:

> Passing off involves defendant's use of plaintiff's well-known product name, symbols or familiar packaging to attract the public to the product under the assumption that it is the plaintiff's product which is bought.

*Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 647 (6th Cir.1982). In order to obtain injunctive relief under Section 43(a), a plaintiff, or in this case the defendant, need only show a "likelihood of confusion" on the part of consumers with respect to the parties' products. Proof of an intent to confuse or the existence of actual confusion is not required. *Frisch's, supra* at 647.

In 1981, the United States Court of Appeals for the Ninth Circuit suggested eight factors to be considered in determining the likelihood of confusion among consumers. *Toho Co., Ltd. v. Sears Roebuck Co.,* 645 F.2d 788 (9th Cir.1981). The *Toho* test was adopted by the United States Court of Appeals for the Sixth Circuit in *Frisch's, supra* at 648. The pertinent factors are:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark; and
8. likelihood of expansion of the product line.

■ In applying these standards to the case at hand, the preponderance of the evidence establishes the following:

### (1) *Strength of Plaintiff's Mark:*

Plaintiffs concede that the Tylenol mark is arbitrary, fanciful and distinctive, and has acquired strong secondary meaning. (Final Pre-Trial Order at V.B. 7.). "Tylenol" is probably the strongest mark in the field of analgesic pain relievers. It is the dominant product in both aspirin and non-aspirin pain reliever markets. Perhaps the best example of the strength of the Tylenol mark is the fact that within the past year, it received nationwide adverse publicity when several persons in the Chicago area were murdered by means of poisoned Tylenol capsules. The product was removed from the market for a period of time while

tamper-resistant packages were developed. Although less than a year has now elapsed, it appears that Tylenol has regained most, if not all, of its former market share.

### (2) Relatedness of the Goods:

The parties agree that the products Tylenol, Actenol, Supernol and Hydenol are identical. All are directed at the non-aspirin, analgesic pain reliever market and all rely upon acetaminophen to achieve their purpose.

### (3) Similarity of the Marks:

The similarity of the names and packaging of the various products has been noted in Findings of Fact 3 and 6. In each instance, the accused product copied the color scheme of Tylenol, and adopted the shape and color of the tablet, the color of the elixir and the color of the capsule with virtually no variation. The style of type selected is again almost identical, and hardly coincidental given the wide variations available in the various fonts of type. A comparison of the lettering in the name of each product indicates that there is substantial similarity in type style. All use block style, upper case letters with the initial letter of the name appearing in larger type. When the elements of type style, color and suffix "nol" are all considered together, it is obvious that there is a substantial similarity of marks.

### (4) Evidence of Actual Confusion:

Defendants in this case did not offer evidence of actual confusion with respect to the various products or the source of plaintiffs' products. The lack of such evidence, however, is not a bar to injunctive relief. *Frisch's, supra* at 648; *Beer Nuts, Inc. v. King Nut Co.,* 477 F.2d 326, 329 (6th Cir. 1973), *cert. denied,* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973). While the plaintiffs offered affidavits of 152 purchasers of Tylenol to the effect that they were not confused as to the nature of the product purchased or its origin, the Court does not find these affidavits controlling on the issue of potential confusion.[7]

### (5) Marketing Channels Used:

The marketing channels for all products in this case are identical. They are sold in drug stores and supermarkets. Indeed, as plaintiffs themselves have pointed out, the accused products tend to be placed on the same shelves and in the immediate proximity to Tylenol. See Plaintiffs' Exhibit 1AA, 2M.

### (6) Likely Degree of Purchaser Care:

The likely degree of purchaser care is not easily determined. On the one hand, the products are medicinal, which might indicate a higher degree of consumer care than with other types of products. On the other hand, the nature of such products is well known and they are relatively inexpensive. Little evidence was presented on this issue and the Court does not find it of controlling significance.

### (7) Defendants' [Plaintiffs'] Intent in Selecting the Mark:

There is no serious argument regarding the plaintiffs' intent in this case. Indeed in the opening statement, plaintiffs' counsel asserted that the purpose of both the name and packaging of the house brands was to be "reminiscent of Tylenol." He stated specifically: "While I draw a distinction, I want to make it very plain that we, along with many other companies, purposely use the 'nol' to be reminiscent of [Tylenol]." Additionally, in response to the Court's inquiry concerning the similar colors chosen

---

**7.** Professor Dornoff noted the high probability of bias in the signing of these affidavits. The purchasers in question all mailed in and received a full rebate on the price paid for the product. They also received a double rebate if they consented to a personal interview. The affidavits were prepared by plaintiffs' counsel and the initial telephone interviews were conducted by counsel or members of his staff. Officials of SuperX obtained the affidavits during the personal interview. In view of the great probability of bias resulting from such techniques, as well as the unrepresentative nature of the sample, the Court attaches little weight to such evidence.

by plaintiffs for their individual brands, plaintiffs' attorney further stated: "Yes, we wanted [the colors] to be similar [to those of Tylenol]. We wanted them to be reminiscent of Tylenol. We wanted people to look at one and it would help them associate in their mind the fact that this product was not only similar to Tylenol, but similar to a particular size or a particular shape." Moreover, a policy of making a house brand resemble a national brand, by both color and the shape of package, adds weight, if weight is needed, to the obvious fact that this was done intentionally. See Finding of Fact 4. The Court also notes in passing the plaintiffs' prior lack of success in marketing their unnamed brands of acetaminophen.

**(8)** *Likelihood of Expansion of Product Line:*

The likelihood the Tylenol product line will be expanded appears to be of less significance than the other factors in this case. Where products do not currently compete directly, future expansion will determine whether or not they will meet head on. In this case, however, the meeting has already occurred. The products in question serve an identical market and are intended to reach the same consumers. Although some evidence has been presented that Tylenol intends to expand its product line, that fact does not appear to have controlling significance.

Although not identified as a factor in *Toho* or *Frisch's,* the Court finds that the survey conducted by Bruno and Ridgeway in this case is probative evidence of the likelihood of confusion. *See Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2nd Cir.1981); *Exxon Corp. v. Texas Motor Exchange,* 628 F.2d 500, 509 (5th Cir.1980). The survey in this case suggested that con-

sumers may be confused both as to the source of plaintiffs' products as well as between the products themselves and Tylenol.

It has been said that the Lanham Act is remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose. *Warner Bros., Inc., supra cited and followed in Frisch's Restaurants, Inc. v. Elby's Big Boy, supra* at 651.

There is something inherently unfair in the effort by plaintiffs to avail themselves of the name and good will of Tylenol.[8] Defendants have expended millions of dollars in advertising their product to the American public. To permit a bystander who has spent a minimum of time, money, and effort in developing its product to profit by marketing the identical commodity with a similar name and packaging is contrary to the stated Congressional purpose of the Lanham Act.[9]

While nursery rhymes have no known precedential value, they frequently contain concepts of inherent wisdom. This case is somehow reminiscent of the plight of the Little Red Hen whose friends declined to plant, harvest or thresh the wheat; grind or bake the flour, but were all too ready to share with her the bread that resulted.

### III. Conclusions of Law

(A) This Court has jurisdiction over the parties and subject matter of this action pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338. In order to obtain injunctive relief under Section 43(a) of the Lanham Act, a plaintiff must demonstrate a likelihood of confusion on the part of consumers with respect to the parties' products. *Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 647 (6th Cir.1982).

(B) Proof of an intent to confuse or the existence of actual confusion is not required

---

**8.** "THE COURT: 'And the money that they [defendants] have spent in advertising their product, you gain the benefit of that by putting your product next to it and using the same color scheme?'
THE WITNESS [Don Elliot, V. Pres. Sales and Procurement for General Merchandise at Kroger]: 'Yes.'" (Tr. at p. 86).

**9.** In *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084 (6th Cir.1983), the Court noted that a newcomer to a market has an affirmative duty to avoid confusion. Plaintiffs in this case have flouted this obligation.

for injunctive relief under the Lanham Act. *Frisch's, supra* at 647.

(C) The preponderance of the evidence in this case establishes a likelihood of confusion between the plaintiffs' products and that of the defendant, as well as confusion as to the source of plaintiffs' products.

(D) Pursuant to Conclusions of Law A–D, defendant is entitled to the injunctive relief sought in its Counterclaim.

IT IS SO ORDERED.

APPENDIX A