**BROCKUM COMPANY, A DIVISION OF KRIMSON CORPORATION**

v.

Andre BLAYLOCK, Antonio Benitez, John Bradley, Sam Brown, Shawn Bucks, John Davitzler, John Davis, Tyrone Dillard, Robert Douglas, John Francis, Timmy Gallagher, Anthony Giovani, Larry Grant, John Green, Raymond Green, Ronald Green, George Greene, Edward Robert Heston, Gene Huie, Glen Huie, Anthony Johnson, Charlotte Johnson, Rodney Jones, Tim Keely, Tony Marzulo, Steve Mauro, Fidel Melendez, Santiago Melendez, John Miller, Jan Murray, Edward O'Reilly, John O'Reilly, Neil O'Toole, Jose Pagan, Anthony Peoples, Joseph Pipps, Albert Quinn, Abe Richardson, Ron Richardson, Juan Rivera, John Rivers, Eric Rodriguez, James W. Rosnack, John Ryan, George Samuels, Jesus Santiago, Chris Scott, Larry Scott, George Scotts, Alvin Shaw, Lincoln Shaw, James Shorter, Gene Simms, Peter Simon, Shareen Smarts, John Smalls, John Smith, Anton Sparks, Peter Joseph Stier, Mark Stobel, Joe Sullivan, Richard W. Szabo, Phillip Thompkins, Michael Ticor, Paul Ticen, Norman Toons, Gus Trainer, Juan Vasquez, Ganders Williams, Tony Williams, Tony Williamson, Michael Wilson, William Wilson, Willie Wilson, LTS Merchandising Co.; John Does 1 through 33, Various John Does, Jane Does and XYZ Co.

Civ. A. No. 89–6244.

United States District Court,
E.D. Pennsylvania.

Jan. 31, 1990.

**440**

Mari Gursky Shaw, M. Kelly Tillery, Philadelphia, Pa., for plaintiff.

Jules D. Zalon, Philadelphia, Pa., for defendant LTS Merchandising Co.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This matter comes before the court upon the plaintiff's motion for a preliminary injunction. A temporary restraining order was entered by this court on August 29, 1989, which enjoined various defendants from manufacturing, distributing and selling unauthorized merchandise bearing the names, likenesses, trademarks or tradenames of the rock music groups, the "Rolling Stones" and "Living Colour". On September 11, 1989, LTS Merchandising Co. (hereinafter "LTS"), sued as "John Doe", filed counterclaims against the plaintiff. On September 14, 1989,[1] a preliminary injunction hearing was held before this court in Easton, Pennsylvania. The plaintiff's request for injunctive relief, which, through the course of the proceedings, had assumed the character of a final injunction, was granted as to LTS. So was the plaintiff's motion to dismiss LTS's counterclaims. As to all other defendants, the court stated that a final injunction was to become final thirty days from September 14, 1989. The court, in making its rulings from the bench, reserved the right to amplify those rulings by means of a written opinion. The instant opinion constitutes such amplification and also comprises those findings of fact and conclusions of law required under Fed.R.Civ.P. 52(a).

Before beginning those findings of fact and conclusions of law, however, we believe that it is first necessary to set forth the circumstances attending the court's ruling from the bench. On September 14, 1989, the plaintiff presented numerous witnesses, documentary evidence, and two videotapes, which were played before the parties and the court. Defense counsel vigorously cross-examined the witnesses testifying on behalf of the plaintiff. At the end of the day, the parties reached an agreement whereby: the plaintiff would rest its case; the defense would rest without calling any witnesses; the defendant would stipulate as to the dismissal, with prejudice, of all of its counterclaims against the plaintiff; a final injunction would be issued without defendant's objection; and the court would file a written opinion at a later date. At the hearing, defense counsel raised no objection or reservation regarding any of this.

At the hearing, the court stated:

The Court has reviewed the matter before it. Since there is no further evidence to be presented, the counterclaim has been dismissed. The Court will indicate its mind at this point in time, reserving the right to supplement this with a further written opinion amplifying the Court's findings today. But I will indicate that on the basis of what I heard I believe I'm compelled to reach the conclusion that no award should be made in terms of damages or attorney's fees. I will, however, determine that the shirt in question which I will characterize as Exhibit Number 2 or the event shirt does appear to be confusingly similar to the Rolling Stones shirt and the Rolling Stones material. Furthermore, it does appear to present a situation in which the use of the shirt amounts to an unfair reaping where the persons vending the shirt have not sown. It's a piggybacking arrangement and based upon all of that I will issue at this point in time, as I under-

---

1. September 12, 1989 is the date given on the transcript of the proceedings in the instant case. The log of these proceedings indicates, however, that "September 14, 1989" is the proper date.

stand there's no objection to issuing a final injunction at this point in time, I will issue a permanent final injunction at this time as to the Defendant LTS effective immediately. And again I will amplify my remarks here today with a written opinion.

Transcript of 9/14/89 Hearing, at 138.

It is to fulfill this statement of the court—to which both parties agreed—that the instant opinion has been written. Below, we set forth the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Brockum Company ("Brockum") is an operating division of Krimson Corporation, a New Jersey corporation having its principal place of business in New York City. Brockum is engaged in the manufacture, distribution and sale of various types of merchandise sold and distributed at concerts of musical performing artists and groups, as well as through retail establishments which embody the names, likenesses and/or trademarks of musical performers or groups. [Complaint ¶ 2; Affidavit of Norman Perry, ¶ 1].

2. Brockum is the exclusive licensee of the right to make and distribute T-shirts and other merchandise bearing the name, likenesses, trademarks, tradenames and associated logos connected with or owned by either the Rolling Stones or companies which have acquired rights from the Rolling Stones. Brockum's affiliated companies have acquired the exclusive right to present, produce and promote the series of concerts comprising the Rolling Stones' North American Tour, August 31, 1989 through December 19, 1989. [Affidavit of Norman Perry; Direct Examination of Thomas Cyrana ("Cyrana"), Transcript of 9/14/89 hearing ("Transcript"), page 58; Direct Examination of Joseph Rascoff ("Rascoff"), Transcript, pages 70–72].

3. Brockum acquired such rights from BCL Finance (Ireland) Limited, which in turn acquired its rights from Promotour US, Inc. Promotour US, Inc. acquired such rights from Musidor B.V. The latter two companies are related to the Rolling Stones. [Cyrana Direct, Transcript, pages 58–59].

4. Defendant LTS Merchandising Co. ("LTS") is a sole proprietorship organized and existing under the laws of the Commonwealth of Pennsylvania and is in the business of manufacturing and selling souvenir merchandise. [Answer and Counterclaims, ¶ 6].

5. As a general matter, in order to conduct its business, Brockum enters into exclusive license agreements pursuant to which Brockum acquires the exclusive right to manufacture, distribute and sell merchandise bearing a performer's name, likeness, logo and trademarks, at concerts and through retail establishments. Brockum undertakes substantial investment to acquire such rights, and then is required to invest additional funds in the design, printing and transportation of the merchandise throughout the United States. Brockum would not undertake such investment without first obtaining exclusive rights from its licensor artists. [Cyrana Direct, Transcript, pages 49, 53, 56].

6. Brockum and its affiliated companies paid in the range of fifty to seventy million dollars for the right to produce and promote the tour and to acquire all rights connected with the Rolling Stones tour, including the exclusive merchandising rights. [Rascoff Direct, Transcript, page 74].

7. After Brockum acquired such rights, Brockum commenced the development of the designs to be utilized on authorized merchandise. [Cyrana Direct, Transcript, page 59]. Brockum is contractually obligated to obtain the approval of the Rolling Stones with respect to all Rolling Stones merchandise to be sold by Brockum. Such approval rights extend to unprinted shirt quality, colors, designs, printing and production runs. [Cyrana Direct, Transcript, page 61].

8. In performing its obligations under its license agreement, Brockum presented samples of the products and designs at each stage of the design and production process to members of the Rolling Stones.

On one occasion, the representative members of the Rolling Stones required Brockum to replace its designer and other creative personnel because it was felt that such individuals did not present the proper image of the Rolling Stones. Brockum thereupon retained another designer in England to work solely on the Rolling Stones' merchandise. [Cyrana Direct, Transcript, pages 62–63].

9. Brockum is obligated by contract to promote the merchandise it sells, both at concert venues and through retail stores. Substantial efforts and expenses have been and are being expended by Brockum in the promotion of tour and wholesale lines of authorized Rolling Stones merchandise, in view of the limited time duration of Brockum's exclusive rights under license. Brockum's exclusive rights with respect to the sale of merchandise at the sites of the Rolling Stones' concert performances on the tour extend from August 31, 1989 to December 19, 1989. [Cyrana Direct, Transcript, pages 64–66; Rascoff Direct, Transcript, pages 70–72].

10. Brockum and its affiliated companies are involved in tour sponsorship, selling concert tickets, tour and retail merchandising, and in promoting press, television and radio coverage of the tour, as well as in general promotion of the Rolling Stones tour and merchandising. [Rascoff Direct, Transcript, pages 70–71].

11. Brockum has assigned approximately fifteen to twenty employees to work full-time on tour and related merchandising matters. In addition, approximately six other Brockum employees drive the trucks and transport the merchandise from one concert venue to another. [Rascoff Direct, Transcript, page 71].

12. Brockum has retained and paid a public relations firm to promote such press coverage. [Cyrana Direct, Transcript, pages 66, 114]. News stories regarding the Rolling Stones clothing line produced by Brockum have appeared in the clothing industry trade publications and in the popular press (Exhibit 5). In addition, Brockum has produced video cassette recordings promoting the Rolling Stones clothing line, including one featuring Mick Jagger discussing the style and quality of the clothing (Exhibits 6 and 7). Such promotional activities have been very costly. [Cyrana Direct, Transcript, pages 116–119].

13. Joseph Rascoff, a certified public accountant who testified for plaintiff, is the business manager for the Rolling Stones and other well-known performers, and is in charge of all business and financial matters for the Rolling Stones. Mr. Rascoff testified that the development of merchandise in connection with the Rolling Stones' tour was an integral part of the overall planning for the tour, which has occupied his full time for a period of nine months. [Rascoff Direct, Transcript, pages 67–69].

14. The tenor of such merchandise is intended to be integrated thematically with the tour. [Rascoff Direct, Transcript, page 69]. The Rolling Stones have enjoyed a successful career in popular music, extending over a period in excess of twenty-six years. [Rascoff Direct, Transcript, pages 67–69]. Such success has been attributed to their efforts to achieve an integration of all Rolling Stones promotions and authorized designs in a manner which bespeaks quality, longevity and the upper crust of the entertainment industry. [Rascoff Direct, Transcript, pages 77–78]. In connection with their present concert tour, the Rolling Stones have been personally involved in aspects ranging from the design of the set and program to the color of the lettering on the security guards' T-shirts. [Rascoff Direct, Transcript, pages 77–78].

15. On an ongoing basis, the Rolling Stones engage a firm to monitor trademark and copyright infringements worldwide. The firm monitors trademark applications, and contests any applications for marks similar to those of the Rolling Stones. [Rascoff Direct, Transcript, page 80].

16. On August 29, 1989, this Court granted Brockum's *ex parte* application for a Temporary Restraining Order and writ of seizure, enjoining various defendants, their agents, servants, employees, attorneys, successors, and assigns from manufacturing, distributing and selling so-called "infringing merchandise" bearing the names,

likenesses, trademarks or tradenames of the Rolling Stones and the musical group, "Living Colour", which was performing with the Rolling Stones on their recent tour. The Court's Order authorized plaintiff Brockum, various persons engaged by Brockum, the United States Marshals and/or state and local police to seize and impound any such infringing merchandise found from twelve (12) hours before to three (3) hours after any performance by these artists within a two (2) mile vicinity of the halls, stadiums or arenas at which these artists were to perform.

17. On the evening of August 31, 1989, Brockum's security personnel and the U.S. Marshals assigned to enforce this Court's Order observed Richard Szabo, who identified himself as an employee of defendant LTS, in the Veterans Stadium parking lot in Philadelphia, Pennsylvania, approximately five hundred yards from the Stadium entrance, nearly two hours before the Rolling Stones were scheduled to perform. [Direct Examination of Richard Long, Deputy United States Marshal ("Long"), Transcript, pages 7, 20–21]. Mr. Szabo was holding for sale and surrendered a quantity of T-shirts, which he represented as totaling forty dozen shirts. A copy of this Court's Temporary Restraining Order was served on Mr. Szabo (Exhibit 3). The United States Marshals completed a USM 102 form (Exhibit 4) indicating seizure of evidence. The items seized were then relinquished to the custody of Brockum's security personnel and brought to an area supervised by Brockum personnel. [Long Direct, Transcript, pages 18, 27].

18. One of the T-shirts seized by the U.S. Marshals from Mr. Szabo (hereinafter referred to as the "LTS shirt") was received in evidence as plaintiff's Exhibit 2. The LTS shirt contains graphic material which makes reference to "The Stones" and "The Rolling Stones", as follows: The front of the LTS shirt sets forth, in stylized script of approximately two to four inches, the legend:

I Saw The Stones at the Vet

In print of approximately one quarter inch, the dates of the Rolling Stones performances are also set forth beneath a small drawing apparently depicting the outline of the stadium. The back of the LTS shirt sets forth the following additional material, in print or script of approximately three to four inches:

I Was There!
The Rolling Stones
Veterans Stadium
Philadelphia, PA
August 31,
September 1, 1989

In addition, in print of approximately one quarter inch, the following disclaimer appears at the bottom of the back of the LTS shirt:

This shirt is produced by LTS Merchandising Co. and is not sponsored or authorized by the Rolling Stones

19. Plaintiff presented testimony that: (1) use of the name "Rolling Stones" on a T-shirt, even without any other design, logo or artwork, would be perceived or identified by purchasers and others as designating merchandise sponsored or authorized by the Rolling Stones; (2) notwithstanding the disclaimer, the LTS shirt competed with authorized Rolling Stones merchandise and would create confusion as to whether such shirt was produced, sponsored, authorized or approved by the Rolling Stones; (3) sale of the LTS shirt would be detrimental to the business interests of plaintiff and the Rolling Stones, due to the lack of control and supervision by plaintiff, the Rolling Stones or their representatives regarding the quality of the merchandise; (4) the LTS shirt was of inferior quality and had nothing of the feel, look, design and thematic concept which plaintiff and the Rolling Stones sought to create and promote through sales of authorized merchandise; (5) because of its lower quality, the LTS shirt would create confusion among purchasers and others by conveying the impression of reduced standards by the Rolling Stones; and (6) sale of the LTS shirt would be injurious to the professional reputation of the Rolling Stones. [Cyrana Direct, Transcript, pages 123–26; Rascoff Di-

rect, Transcript, pages 82–85; Rascoff Cross, Transcript, pages 99–102].

20. LTS has characterized the LTS shirt as an " 'event shirt' which celebrated the event." [Defendant's Memorandum of Law, page 1]. In its nature and substance, and in view of the manner in which it was to be offered for sale, the LTS shirt appears deliberately intended to compete with the authorized merchandise created by plaintiff and approved by the Rolling Stones.

21. Notwithstanding the disclaimer printed on the LTS shirt, the desire to compete with authorized merchandise is clear, particularly in light of the defendant's intention to sell the LTS shirt immediately before and after concerts of the Rolling Stones, in the immediate vicinity of the concert venues. Because LTS is not obligated to obtain approvals of the Rolling Stones or pay for the right to make authorized merchandise, LTS is able to manufacture and sell its merchandise at a substantially lower price than any authorized merchandiser such as Brockum. [Cyrana Direct, Transcript, pages 125–126].

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter of this litigation by reason of the Federal question raised by the claims based upon section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), 15 U.S.C. § 1121, 28 U.S.C. § 1338. Also, in view of the diversity of citizenship between the plaintiff and the defendant and in view of an amount in controversy in excess of $50,-000, this court has jurisdiction under 28 U.S.C. § 1332(a) as well.

2. Defendant LTS has appeared herein and this court has personal jurisdiction over such defendant.

3. 15 U.S.C. § 1125(a) provides, *inter alia:*

Any person who shall affix, apply or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such

goods ... to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

■ 4. There is no necessity under section 43(a) that the marks in question be registered. *Winterland Concessions Co. v. Creative Screen Design, Ltd.,* 214 U.S. P.Q. 188, 191 (N.D.Ill.1981). Moreover, section 43(a) is to be broadly construed. *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649 (3d Cir.1954).

■ 5. The sale of T-shirts bearing the names, trademarks, logos, tradenames or likenesses of well-known performers or groups without their consent constitutes a violation of § 43(a). *Winterland Concessions Co. v. Sileo,* 528 F.Supp. 1201 (N.D. Ill.1981), *modified on other grounds, sub nomine Winterland Concessions Co. v. Trela,* 735 F.2d 257 (7th Cir.1984), *aff'd mem.,* 830 F.2d 195 (7th Cir.1987); *Billy Joel v. Various John Does,* 499 F.Supp. 791 (E.D.Wis.1980).

■ 6. Defendant LTS cannot obtain a "free ride" at the plaintiff's expense. Its shirts are designed to take advantage of the efforts and expenditures of the plaintiff and benefit from the goodwill associated with the Rolling Stones, their 1989 tour, and the promotion of the event created or undertaken by the plaintiff and the Rolling Stones. Such unlicensed use of the Rolling Stones' name would permit the defendant to reap where it had not sown. *Boston Athletic Association v. Sullivan,* 867 F.2d 22, 33 (1st Cir.1989). Defendant's argument that the T-shirt in question merely celebrates an "event" is circular reasoning, at best, given the fact that there would be no "event" to celebrate, were it not for the hard work and financial outlay provided by the plaintiff.

■ 7. Functional symbols are those that are essential to the use of a product, as opposed to those which merely identify it. Such symbols are not protected under section 43(a). *Warner Brothers, Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 330 (2d Cir.

1983). The use of the Rolling Stones' name on the merchandise before the court is not functional. "[O]nly functions which represent development of useful features, and not functions which serve merely to identify, are considered in determining functionality...." *Id.* at 332. The name "Rolling Stones", as used by the defendant, provides identification—an identification that the defendant seeks to trade upon and to misappropriate.

■ 8. In order to obtain injunctive relief under section 43(a), only a likelihood of confusion on the part of consumers need be shown. *Kroger Co. v. Johnson & Johnson,* 570 F.Supp. 1055, 1058 (S.D.Ohio 1983).

■ 9. Among the relevant factors to consider in assessing likelihood of confusion are the strength of a mark, the proximity of the goods, similarity of the marks, evidence of actual confusion, marketing channels, the nature of the goods, the degree of care to be exercised by a purchaser, the defendant's interest, and the likelihood of expansion of the product lines. *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–349 (9th Cir.1979). Lack of evidence of *actual* confusion is not a bar to injunctive relief. *Kroger Co.,* 570 F.Supp. at 1059. In the instant case, however, most of the other criteria have been met. The defendant has appropriated the very name of the Rolling Stones, a fixed star in the popular music firmament for over twenty-six years. The defendant has intended to sell products bearing that name in the vicinity of the Rolling Stones' concerts simultaneously and adjacent to sales of authorized Rolling Stones merchandise. T-shirts are relatively inexpensive items of apparel and, as such, are unlikely to be the object of careful and intensive scrutiny by a prospective purchaser. The defendant would appear to have very little interest worthy of consideration, since it has invested neither its hard work nor its finances in generating enthusiasm and public curiosity about the Rolling Stones' recent tour. The plaintiff does plan to expand its apparel product line; however, it would appear that such expansion lies in more than just T-shirts. Since most of the *AMF, Inc.* criteria have been met, we believe that a likelihood of confusion certainly exists.

■ 10. Likelihood of confusion is not cured by good faith disclaimers. *International Kennel Club, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079 (7th Cir.1988). Moreover, in the instant case, the disclaimer was only affixed in small print at the bottom of the back of the defendant's T-shirts.

11. *University of Pittsburgh v. Champion Products, Inc.,* 566 F.Supp. 711 (W.D. Pa.1983), a case initially relied upon by the defendant, is distinguishable from the case at bar. In *University of Pittsburgh,* the plaintiff did *not* market similar goods. Moreover, the defendant had been in business for forty-seven years, had actually been the plaintiff's supplier of goods for a period of years, and had sold the same goods openly to other accounts without objection. *University of Pittsburgh* cannot be used to lend legitimacy to the sale of so-called "bootleg" T-shirts.

12. "American jurisdictions have recently recognized the right of well-known individuals to control commercial exploitation of their names and likenesses. Called the 'right of publicity', *Haelan Laboratories v. Topps Chewing Gum,* 202 F.2d 866, 868 (2d Cir.1953), or the tort of 'appropriation' of name or likeness, *Prosser and Keeton on the Law of Torts* (5th ed. 1984) at 851, this right has been recognized in some form by virtually all states. *See id.* at 850–51(4)27" *Bi–Rite v. Bruce Miner Co., Inc.,* 757 F.2d 440 (1st Cir.1985).

13. The right [of publicity] protects against commercial loss caused by appropriation of an individual's personality for commercial exploitation. J.T. McCarthy, *Trademarks and Unfair Competition* § 10:21 at 375 (2d ed. 1981). Right of publicity grants a person an exclusive right to control the commercial value of his name and likeness and to prevent others from exploiting that value without permission. *Bi–Rite Enterprises, Inc. v. Button Master,* 555 F.Supp. 1188, 1198 (S.D.N.U. [*sic* ] 1983).

*Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc.,* 627 F.Supp. 856, 862 (E.D.Pa.1985).

14. A musical group, as well as an individual performer, has a protectable right of publicity. *Id.* at 862; *Bi–Rite Enterprises, Inc. v. Button Master*, 555 F.Supp. 1188, 1199 (S.D.N.Y.1983); *Sileo*, 528 F.Supp. at 1213.

15. The unauthorized printing on defendant's T-shirts of the name "The Rolling Stones" is a violation of the right of publicity of that musical performing group. The right of publicity may be legally and validly transferred from an entertainer or musical group to a corporate third-party licensee such as plaintiff Brockum. *Id.* at 1201. Prior to the date of the hearing, plaintiff Brockum had been granted an exclusive license to print the name "The Rolling Stones" on its T-shirts.

16. The instant case originally came before the court upon the plaintiff's motion for a preliminary injunction. In the Third Circuit, the standard for the issuance of a preliminary injunction is clear. For a party to obtain a preliminary injunction, that party must show (1) a reasonable probability of eventual success in the litigation and (2) irreparable injury to the movant, if the relief is not granted. If relevant, the court should also consider (3) the possibility of harm to other interested persons from the grant or denial of the injunction and (4) the public interest. *Dominion Bankshares Corp. v. Devon Holding Co., Inc.*, 690 F.Supp. 338, 344 (E.D.Pa.1988). Had the instant case remained on that level, all of these criteria would have been met and a preliminary injunction would have issued forthwith.

17. By agreement of the parties, however, a permanent final injunction was entered by the court. "In a case for service mark or trademark infringement and unfair competition, a plaintiff is entitled to a permanent injunction against a defendant by showing that that defendant's activities are likely to confuse consumers as to the source or sponsorship of the goods. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, *supra* [589 F.2d 1225] at 1228 [ (3rd Cir. 1978) ]; *Salton, Inc. v. Cornwall Corp.*, 477 F.Supp. 975, 989 (D.N.J.1979)." *National Football League Properties v. N.J. Giants*, 637 F.Supp. 507, 516 (D.N.J.1986).

18. We believe that the plaintiff has met the burden imposed upon it by *National Football League Properties*, 637 F.Supp. 507, as to confusion of consumers regarding the source of the goods in question. We also believe that the plaintiff will suffer irreparable harm unless such an injunction is issued.

Accordingly, on September 14, 1989, the court issued a permanent final injunction as to defendant LTS and continued the preliminary injunction as to any and all other defendants with the understanding that it would become final in thirty days. Since the Rolling Stones' tour is now over and there have been no further requests for hearings, and since more than thirty days have elapsed since September 14, 1989 when the court indicated that the preliminary injunction would become final as to all other defendants, it is appropriate that this matter be closed.