**WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., a Delaware corporation, Plaintiff,**

v.

**BIG DOG HOLDINGS, INC., a Delaware corporation, Defendant.**

No. 01–CV–394.

United States District Court, W.D. Pennsylvania.

March 10, 2003.

416

Jerry S. McDevitt, Robert L. Byer, Curtis B. Krasik, Jill D. Helbling, Kirkpatrick & Lockhart, Pittsburgh, PA, for Plaintiff.

Mark R. Hamilton, Zimmer Kunz, Pittsburgh, PA, Jacqueline A. Criswell, David Butman, Tressler, Soderstrom, Maloney & Priess, Chicago, IL, for Defendant.

## OPINION OF THE COURT

CERCONE, District Judge.

### I. INTRODUCTION

The Worldwide Wrestling Federation Entertainment, Inc. ("WWE") filed a seventeen (17) count Amended Complaint asserting claims against Big Dog Holdings, Inc. ("Big Dog") for copyright infringement (Counts I through VI), trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114, (Count VII), trademark infringement and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), (Count VIII), trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), (Count IX), misappropriation and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), (Count X), trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), (Count XI), violation of the Pennsylvania anti-dilution statute, 54 PA. CONS. STAT. ANN. § 1124 (Count XII), violation of Pennsylvania fair trade practices statutes, 73 PA. CONS. STAT. ANN. §§ 201–2 and 201–3 (Count XIII), unfair competition under the common law of Pennsylvania (Count XIV), and violation of the right of publicity under the common law of Pennsylvania (Counts XV, XVI, and XVII).

Following the close of discovery, Big Dog filed a Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. WWE has responded and the motion is now before the Court.

### II. STATEMENT OF THE CASE

#### A. The Contestants

WWE is an integrated media and entertainment company engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events, and the licensing and sale of branded consumer products. (Am. Cmplnt. ¶¶ 11 and 16). WWE has been involved in the sports entertainment business for over twenty (20) years and has developed story lines based around its wrestling characters. (Am. Cmplnt. ¶¶ 17 and 18). Currently, WWE produces five television programs each week: (i) "Raw" and "War Zone" shown consecutively on Monday nights and known as "Raw is War"; (ii) "WWF Smackdown!" on Thursday nights; (iii) "Live Wire" on Saturday mornings; (iv) "Superstars" on Sunday mornings; and (v) "Heat" on Sunday nights. (Am. Cmplnt. ¶ 17).

Through its programming, described by WWE as "... action-packed episodic drama ... akin to an ongoing, ever-developing soap opera," WWE has developed popular wrestling characters appearing under unique names and portrayed with unique persona, history relationships, music and visual appearance, and behavior. (Am. Cmplnt. ¶¶ 17 and 19). A principal component of WWE's business is the merchandising and licensing of branded consumer products depicting these characters' names, likenesses, signature phrases, as well as depicting WWE's programming. (See Appendix to WWE's Opposition to Big Dog's Motion for Summary Judgment Exhibit R) (hereinafter "WWE Exhibit ___"). These branded consumer products are marketed and sold through two separate operations: (1) WWE direct merchandising, which refers to WWE's own design,

production and sale of product principally through WWE's internet website, semi-annual catalogs and sales at live events; and (2) licensing, which refers to WWE's licensing of its intellectual property by category (i.e., t-shirts, trading cards, posters, action figures, etc.) to third-party companies that pay royalties to WWE on product sales.[1] (WWE Exhibit T, p. 6 lines 7–22). WWE, in turn, pays royalties to the individual portraying the character based on revenues from the sales of products depicting the individual's WWE character. (WWE Exhibit Q, ¶ 6).

Through predecessor companies, Big Dog has been in business since 1983, and its first full year of operations under current ownership was in 1993. (Big Dog Exhibit G, ¶ 1). Big Dog develops, markets, and retails a branded lifestyle collection of unique, high quality, popular priced consumer products, including active wear, casual sportswear, accessories and gifts. (Big Dog Facts ¶ 18). Big Dog has registered trademarks in both "Big Dogs" and its famous dog design logo. (Big Dog Facts ¶ 35). Its merchandise is sold solely through its own Big Dog stores, its catalogs, and through Big Dog's website. (Big Dog Facts ¶ 19). It is Big Dog's contention that it has always developed certain graphics as parodies of popular culture which poke fun at what is going on in the world. (Big Dog Exhibit F at pp. 13 and 18; Big Dog Exhibit J). Big Dog further contends that the depiction of the Big Dog character over and over in different contexts is part of a long-running joke that consumers have come to identify with the Big Dog brand. (WWE Exhibit A, p. 110:lines 1–12).

Big Dog contends that its Big Dog character is intended to be irreverent, funny, and not afraid to make fun of "overinflated aspects of our society." (WWE Exhibit A, p. 92: lines 15–18). Moreover, Big Dog alleges that its t-shirts appeal to customers who enjoy mocking "over-promoted pop phenomena" that are prevalent in today's media. (Big Dog Facts ¶ 32). The Big Dog graphics ridicule, poke fun at, and mock these self-serious icons by characterizing them as dogs, particularly associating them with the Big Dog character, giving them humorous names, and "dogifying" them. (WWE Exhibit A, p. 68: lines 18–25; p. 69: lines 1–6). A Big Dog graphic artist described "dogify" as a means "to satirize a given entity by giving him big floppy ears, a big silly tail, turning him into this variety of dog that we turn everything into." (WWE Exhibit B, p. 12: lines 5–8). The dog graphic essentially is a caricature of the intended subject, copying elements of the subject so in satirizing a particular person or thing, it is recognizable to the public. (WWE Exhibit B, p. 15: lines 1–16). Big Dog continues its long-running dog joke parody by always inserting the dog and showing the Big Dog character in many different contexts. (WWE Exhibit A, p. 110: lines 1–12)

### B. *WWE's Intellectual Property*

"THE ROCK", portrayed by Dwayne Johnson, "STONE COLD STEVE AUSTIN", portrayed by Steve Williams, and the "UNDERTAKER", portrayed by Mark Calloway, have been three of the WWE's most popular wrestling characters over the past five (5) years. (WWE Exhibit Q, ¶¶ 7 and 8). WWE alleges that it has developed and promoted THE ROCK since 1997, and has created and developed a unique trademarked name, persona and trade dress for THE ROCK. (Am. Cmplnt.

---

1. Selected licensees place the merchandise in what is known as "downstairs class of trade," which includes retail stores such as Kmart, Costco, Wal–Mart and Target. (Big Dog's Statement of Undisputed Facts ¶ 8)(hereinafter "Big Dog Facts ¶ ___").

¶¶ 27 and 28). Similarly, a unique trade-marked name, persona and trade dress has been created, developed and promoted by WWE for STONE COLD STEVE AUSTIN since 1996, and the UNDERTAKER since 1990. (Am. Cmplnt. ¶¶ 47, 48, 67, 68 and 69). WWE further contends that it owns trademarks and service marks in THE ROCK, STONE COLD STEVE AUSTIN, and the UNDERTAKER.[2] (Am. Cmplnt. ¶¶ 42, 61 and 80; WWE Appendix Exhibit EE). In addition, WWE claims ownership in trademarks and service marks for: (1) registrations for WWF; (2) the WWF scratch logo; (3) WWF Smackdown! design mark; and (4) AUSTIIN 3:16. (Am. Cmplnt. ¶¶ 21, 22, 24, 61, 88, and 89; WWE Appendix Exhibits DD and EE).

In conjunction with its registration of THE ROCK mark, WWE alleges that it has acquired common law trademarks in THE ROCK's signature catch phrases and slogans: "Know Your Role"; "Jabroni"; and the "Brahma Bull". (Am. Cmplnt.¶¶ 40–43). WWE also contends it has acquired a common law trademark in THE ROCK's Brahma Bull design mark. (Am.Cmplnt.¶ 43).

Integral to WWE's portrayal of the STONE COLD STEVE AUSTIN character is the use of catch phrase slogans and symbols, including: "Open Up a Can of Whoop Ass"; "Austin 3:16"; "Rattle-snake"[3]; "Cause Stone Cold Said So"; and the Skull design. (Am.Cmplnt.¶ 59). WWE contends that it has acquired a com-mon law trademark in the "Open Up a Can of Whoop Ass," "Rattlesnake," and the "Cause Stone Cold Said So" marks and the Skull design mark. (Am.Cmplnt.¶ 63).

In addition to their unique persona and character, WWE has portrayed THE ROCK, STONE COLD STEVE AUSTIN and the UNDERTAKER characters with unique and distinctive trade dress. A cen-tral component of THE ROCK's trade dress is the Brahma Bull symbol. Not only is THE ROCK often referred to as the "Brahma Bull," but he has a tattoo of a Brahma Bull on his right arm, and his clothing, including his wrestling trunks, t-shirts and black leather jacket, bear the image of a Brahma Bull. (Am.Cmplnt.¶ 31). THE ROCK is generally portrayed wear-ing tinted sunglasses, which are often tipped down to reveal THE ROCK's signa-ture facial expressions, most notably, the "People's Eyebrow."[4] (Am.Cmplnt.¶ 31). STONE COLD STEVE AUSTIN is gen-erally depicted with solid black wrestling trunks, black wrestling boots, no shirt and an open black leather vest with an image of a white skull on the left side and the name "AUSTIN" written vertically in white lettering down the right side. (Am. Cmplnt.¶ 50).

To further the "menacing persona" of the UNDERTAKER, he has been general-ly portrayed in all black clothing with black leather designs on the legs, a black leather vest with silver buckles, and tat-toos covering his body. (Am.Cmplnt.¶ 70). The UNDERTAKER also wore black el-bow pads, black leather fingerless gloves, black leather boots, and often entered the

---

2. WWE is the exclusive owner of valid copy-right registrations in photographs of THE ROCK character, the STONE COLD STEVE AUSTIN character, and the UNDERTAKER character. (Am. Cmplnt. ¶¶ 33, 52, and 73).

3. STONE COLD STEVE AUSTIN is also iden-tified on WWE programming as the "Rattle-snake." (Am.Cmplnt.¶ 49).

4. THE ROCK's signature facial expression is known as the "People's Eyebrow," in which he raises his right eyebrow while staring, with intimidation in his eyes, at his opponent or the crowd. (Am.Cmplnt.¶ 29).

ring wearing a long black cape. (Am. Cmplnt.¶ 71). The persona, trade dress and character traits of THE ROCK, STONE COLD STEVE AUSTIN, and the UNDERTAKER are used by WWE in its merchandising of a myriad of products, including photographs, shirts, posters, videos, and action figures. (Am. Cmplnt. ¶¶ 32, 51 and 72).

## C. *The Alleged Infringements*

In November of 1998, Big Dog began selling merchandise which makes reference to WWF and its wrestling characters (collectively "the WBDF merchandise"). (Big Dog Facts ¶ 23). The WBDF merchandise consists of eight (8) graphic designs which appear primarily on t-shirts, but also appear on a mug, sports bottle, stickers and two (2) beanie dolls. (Big Dog Facts ¶ 24; Big Dog Exhibit K).

The first WBDF merchandise sold in November of 1998 was a t-shirt with the slogan "LIVE ON–PAW–PER–VIEW" "WBDF v. Bad Dogs of the Empire." (Big Dog Facts ¶ 30; Big Dog Exhibit K). The graphic depicts dog caricatures of two (2) Star Wars villains, "Emperor Pawpetine" and "Bark Maul," fighting two (2) wrestling characters, "Hollywoof Hound Hogan" and "Bone Cold Steve Pawstin," also depicted as dog caricatures. At the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." (Big Dog Exhibit K). According to Big Dog, the graphic was meant to mock the new "Star Wars" movie coming out at the time, and to do so in multiple arenas. (WWE Exhibit B, p. 34: lines 23–24; WWE Exhibit C, p. 78: lines 10–16). Because it was decided to make wrestlers part of the graphic, it was also meant to parody the WWF and cable television. (WWE Exhibit C, p. 78: lines 19–21).

WWE contends this graphic violates its intellectual property rights by, *inter alia:*

(a) featuring an image of STONE COLD STEVE AUSTIN wearing STONE COLD STEVE AUSTIN's characteristic trade dress;

(b) featuring STONE COLD STEVE AUSTIN holding a folding chair similar to those chairs often used as props on WWE programming;

(c) printing "WBDF" in large block letters at the top of the graphic; and

(d) printing "Bone Cold Steve Pawstin" across the image of STONE COLD STEVE AUSTIN.

(Am.Cmplnt.¶ 99).

The next graphic marketed by Big Dog is a "Bone Cold Steve Pawstin" graphic featuring a dog caricature of the STONE COLD STEVE AUSTIN character with the words " 'Bone Cold' Steve Pawstin" at the top of the graphic and the phrase "Open Up a Can of Woof Ass!" at the bottom. Also, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." (Big Dog Exhibit K). WWE contends this graphic violates its intellectual property rights by, *inter alia:*

(a) featuring an image of STONE COLD STEVE AUSTIN wearing STONE COLD STEVE AUSTIN's characteristic trade dress, specifically an open black vest with the image of the SKULL design (though it's a skull with dog ears) on the left side of the vest with the word "Pawstin" on the right. The dog's face has a goatee, a gold link necklace and a gold hoop earring in his left ear;

(b) printing "Bone Cold Steve Pawstin" across the top of the graphic in large blue block letters;

(c) printing the words "Open Up a Can of Woof Ass!" at the bottom of the graphic; and

(d) printing the letters "WBDF" on the belt buckle of the caricature in reference to WWE's WWF mark.

(Am.Cmplnt.¶ 96).

A third graphic at issue depicts four (4) caricatures of wrestling characters, "Hollywoof Hound Hogan," "Bone Cold Steve Pawstin," "Goldbark," and "The Underdogger," with WBDF at the top of the graphic and the phrase "The Big Dogs of Wrestling" at the bottom. Also, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." (Big Dog Exhibit K). WWE contends this graphic violates its intellectual property rights by, *inter alia:*

(a) featuring an image of THE UNDERTAKER wearing the characteristic trade dress of THE UNDERTAKER. The dog's face is depicted with a beard and long hair;

(b) featuring an image of STONE COLD STEVE AUSTIN wearing STONE COLD STEVE AUSTIN's characteristic trade dress. STONE COLD STEVE AUSTIN is holding a championship belt across his shoulder, and the dog's face is depicted wearing a goatee;

(c) printing the words "The Underdogger" across the image of THE UNDERTAKER; and

(d) printing the words "Bone Cold Steve Pawstin" across the image of STONE COLD STEVE AUSTIN.

(Am.Cmplnt.¶ 98).

The next graphic features three (3) caricatures of wrestling characters "Hollywoof Hound Hogan," "Bone Cold Steve Pawstin," and "The Underdogger," with WBDF in scratch lettering at the top left of the graphic and the phrase "All the Right Moves" down through the center of the graphic. The phrase "All the Right Moves" is surrounded by each of the wrestling characters shown demonstrating a wrestling move on another dog wrestling character. The wrestling moves are named "The Bone Crusher," "The Dog Pounder," and "The Choke Chain." Also, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." (Big Dog Exhibit K). WWE contends this graphic violates its intellectual property rights by, *inter alia:*

(a) featuring an image of STONE COLD STEVE AUSTIN wearing STONE COLD STEVE AUSTIN's characteristic trade dress and performing a wrestling move. The dog's face is depicted wearing a goatee;

(b) featuring an image of THE UNDERTAKER wearing the characteristic trade dress of THE UNDERTAKER and performing a wrestling move. The caricature has tattoos covering its arms similar to THE UNDERTAKER. The dog's face is depicted with long hair;

(c) printing the words "The Underdogger" beside the image of THE UNDERTAKER;

(d) printing the words "Bone Cold Steve Pawstin" beside the image of STONE COLD STEVE AUSTIN; and

(e) printing "WBDF" in a lettering style identical to the WWF scratch logo.

(Am.Cmplnt.¶ 100).

The fifth Big Dog graphic is a caricature of THE ROCK, again the WWE wrestling character is depicted as a dog, wearing sunglasses and a leather jacket with the name "The Rock-weiler" at the top of the graphic and the phrase "Know Your Role, Ja BONEil" at the bottom of the graphic. Also, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." (Big Dog Exhibit K).

WWE contends this graphic violates its intellectual property rights by, *inter alia:*

(a) featuring an image of THE ROCK wearing the trade dress of THE ROCK, specifically a black leather jacket with the image of the BRAHMA BULL design on the sleeve. The dog's face is shown giving the "People's eyebrow," and the nose is the outline of a Brahma Bull;

(b) printing the words "The Rock-weiler" across the top of the graphic with the word Rock printed in larger size block letters that appear to be made out of stone; and

(c) printing the words "Know Your Role, JaBONEil" at the bottom of the graphic.

(Am.Cmplnt.¶ 94).

The sixth Big Dog graphic has "WBDF" in scratch lettering at the top of the graphic and the phrase "Smackdown" at the bottom. Between the phrases is an image of two hands smashing a folding chair, with the words "Big Dogs" on it, into the face of a dog with the outline of the dog's face appearing on the seat of the chair. Also, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." (Big Dog Exhibit K). WWE contends this graphic violates its intellectual property rights by, *inter alia:*

(a) printing the letters "WBDF" in red letters across the top of the graphic in a lettering style like the WWF scratch letter logo;

(b) printing WWE's "Smackdown" in letters across the bottom of the graphic in the same lettering of WWE's "WWF SMACKDOWN!" design mark; and

(c) featuring between the above mentioned writings an image of two hands smashing a folding chair, similar to the chairs used as props on

WWE programming, into the face of a dog with the outline of the dog's face appearing through the smashed chair.

(Am.Cmplnt.¶ 95).

The next Big Dog graphic is a caricature of STONE COLD STEVE AUSTIN, again the WWE wrestling character is depicted as a dog, wearing blue jeans and a black t-shirt with the phrase "Pawstin 3:16" printed on the t-shirt. The figure also has a tail which is wrapped with a bandage. Below the figure are two rattlesnakes, each facing a skull that has dog ears and a tire tread across the face. On and among the snakes is the name "Bone Cold Steve Pawstin," and below the name is the phrase "Because Bone Cold Said So!" Also, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." (Big Dog Exhibit K). WWE contends this graphic violates its intellectual property rights by, *inter alia:*

(a) featuring an image of STONE COLD STEVE AUSTIN wearing STONE COLD STEVE AUSTIN's characteristic trade dress, specifically a black t-shirt with "Pawstin 3:16" printed in white on the front. The dog's face has a goatee, and a gold hoop earring in his left dog ear;

(b) printing the words "Bone Cold Steve Pawstin" underneath the image of STONE COLD STEVE AUSTIN in stylized letters in connection with the image of the rattlesnake and the skull design mark; and

(c) printing the words "Because Bone Cold Said So!" across the bottom of the graphic, a reference to WWE's common law trademark phrase.

(Am.Cmplnt.¶ 97).

The final graphic complained of is a design based upon a poster promoting a movie that was to be (and was) released in

May of 2001, "The Mummy Returns." The graphic depicts five (5) characters from the movie caricatured as dogs: (a) "Brendan Furasier as Rick O'Collie," (b) "Evelyn Caninevon," (c) "Ardeth Stray," (d) "Imhotdog," and (e) "Scorpion K–9." At the bottom of the graphic are the words "THE DOGGY RETURNS." Situated among the characters is the Big Dog character wrapped like a mummy, and the words "Big Dogs" are printed on the forehead of the "Ardeth Stray" character. Also, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." (Big Dog Exhibit K). Dwayne Johnson, who portrays WWE's THE ROCK character, plays the part of the Scorpion King in the movie. WWE contends the depiction of the Scorpion K–9 on the graphic exploits its intellectual property rights in THE ROCK. (Am. Cmplnt.¶¶ 113, 114). WWE, further, contends this graphic violates its intellectual property rights by, *inter alia:*

(a) "depicting THE ROCK with a dog's face in such a way as it appears THE ROCK is making his signature facial expression, the People's Eyebrow"; and

(b) printing the words "The Rock–Weiler as the Scorpion K–9" next to the caricature of THE ROCK.[5]

(Am.Cmplnt.¶ 114).

Big Dog also produces, markets and sells the following products which WWE contends unlawfully exploits and trades on WWE's intellectual property:

(a) a beanie doll toy called "The Rock-weiler" which depicts a dog dressed

in what WWE contends is THE ROCK's characteristic trade dress;

(b) a beanie toy called "Steve Pawstin" which depicts a dog dressed in what WWE contends is STONE COLD STEVE AUSTIN's characteristic trade dress; [6]

(c) a coffee mug which contains the same image as the "Big Dogs of Wrestling" graphic;

(d) a sports bottle which contains the same image as the "Big Dogs of Wrestling" graphic;

(e) a sports cap which contains the same image as the Rock-weiler graphic; and

(d) a sticker which contains the same image as the Rock-weiler graphic.

(Am.Cmplnt.¶¶ 105, 107–110).

WWE argues that Big Dog has blatantly exploited and traded on the intellectual property owned, marketed and licensed by WWE. Big Dog contends that the WBDF merchandise qualifies as parodies or some other form of expressive statements about WWE and its wrestling characters that entitle Big Dog to First Amendment protection in the Court's analysis under copyright and trademark law. Further, Big Dog contends that, whether analyzed under trademark, dilution, copyright or right of publicity law, the WBDF merchandise constitutes a permissible means of expression, and it is entitled to judgment as a matter of law.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(c), summary judgment shall be granted when

---

5. Neither the graphic contained in Big Dog Exhibit K nor the sample t-shirt filed with the Court at Big Dog Exhibit L (a group exhibit containing actual WBDF merchandise) contains the printed words "The Rock–Weiler as . ." Only the words "Scorpion K–9" are set forth in the graphics.

6. The Steve Pawstin beanie doll was also part of Big Dog Exhibit L, but it is not mentioned . WWE's Amended Complaint.

there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, i.e., one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id.* The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir.1999), *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. 1348.

The Second Circuit is instructive in applying these principles to the question of "fair use" in the context of copyright analysis. *See Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1257–58 (2d Cir.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987). Although "fair use is a mixed question of law and fact," *Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), on more than one occasion courts in the Second Circuit have resolved fair use determinations at the summary judgment stage. *See, e.g., Maxtone–Graham,* 803 F.2d 1253; *Berlin v. E.C. Publications, Inc.,* 329 F.2d 541 (2d Cir.), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964); *Time Inc. v. Bernard Geis Assocs.,* 293 F.Supp. 130 (S.D.N.Y.1968). "The mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues to be tried." *Maxtone–Graham,* 803 F.2d at 1258 (*quoting Meeropol v. Nizer,* 417 F.Supp. 1201, 1208 (S.D.N.Y.1976), *rev'd in part on other grounds,* 560 F.2d 1061 (2d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978)). The fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area; however, it does not protect the copyright holder from summary disposition of its claims where there are no material factual disputes. *Wright v. Warner Books, Inc.,* 953 F.2d 731, 735 (2d Cir.1991).

In the trademark context, if the record contains no evidence of actual confusion between the parties' marks, the Court can conclude that "no likelihood of confusion exists as a matter of law." *See generally V Secret Catalogue, Inc. v. Moseley,* 2000 WL 370525, 2000 U.S. Dist. LEXIS 5215 (W.D.Ky.2000).

## IV. DISCUSSION

### A. *WWE's Copyright Claims*

■ WWE contends that Big Dog violated the Copyright Act of 1976 by infringing upon WWE's copyrighted property associated with THE ROCK, STONE COLD STEVE AUSTIN, and the UNDERTAKER. (Am. Cmplnt. Counts I through VI). Copyright infringement is established if the plaintiff proves: (1) that it owned the copyrighted material; and (2) that the copyrighted material was copied[7] by the defendant. *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 290 (3d Cir.1991); *Whelan Associates v. Jaslow Dental Laboratory*, 797 F.2d 1222, 1231 (3d Cir.1986); *Major League Baseball Promotion Corp. v. Colour–Tex, Inc.*, 729 F.Supp. 1035, 1039 (D.N.J.1990). For the purpose of this Motion for Summary Judgment only, Big Dog assumes that WWE has established the elements required to prove copyright infringement, but contends that any use of WWE's alleged intellectual property was lawful.

■ Federal copyright law provides an exception to the prohibition on reproduction of a copyrighted work where the reproduction qualifies as "fair use." 17 U.S.C. § 107. The fair use doctrine was fashioned as a "guarantee of breathing space" within the confines of copyright that allows for new transformative works that further the public discourse and the free exchange of ideas in order to promote science and the arts. *See Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). As Justice Story recognized,

> in truth, in literature, in science and in art, there are, and can be, few, if any,

things, which in the abstract sense are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before.

*Emerson v. Davies*, 8 F. Cas. 615, 619 (C.C.D.Mass.1845) (No. 4,436). Application of the fair use doctrine "always depends on consideration of the precise facts at hand." *Lucent Information Management v. Lucent Technologies*, 5 F.Supp.2d 238, 242 (D.Del.1998) (*citing American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 916 (2nd Cir.1995).) The factors that a court should consider when determining whether use of a work in a particular case is a fair use under the statute are:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

*See* 17 U.S.C. § 107.

Big Dog argues that its graphics are entitled to a measure of protection under the fair use doctrine as parodies of the WWE property. Although the statute does not specifically list parodies among the categories of potentially "fair" uses, the Supreme Court has authoritatively confirmed the applicability of the fair use doctrine to parodies. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. at 579, 114 S.Ct. 1164. In *Campbell*, the Court initial-

---

7. Copying is a "shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106," *Paramount Pictures v. Video Broadcasting Sys-* *tems*, 724 F.Supp. 808, 819 (D.Kan.1989), including the rights to distribute and reproduce copyrighted material. *See Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d at 291.

ly noted that "parody may or may not be fair use," *id.* at 581, 114 S.Ct. 1164, and "parody, like any other use, has to work its way through the relevant factors." *Id.* Specifically relating its first-factor analysis to parodies, the Court stated, "the heart of any parodist's claim to quote from existing material is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Id.* at 580, 114 S.Ct. 1164.

### (1) *The Purpose and Character of the Use*

■ The first factor in this fair use analysis requires an examination of two aspects, the character and the purpose, of the Big Dog graphics. Prior to *Campbell,* courts over emphasized the purpose of the use, finding "every commercial use of copyrighted material [to be] presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). The Supreme Court in *Campbell,* however, has definitively held that a finding of fair use is not barred by the commercial nature of the work. In so holding, the Court stated "the statute makes clear that the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry ..." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. at 584, 114 S.Ct. 1164. There is no issue herein with regard to the commercial purpose of Big Dog's graphics. The Court will therefore move on to the character of the works and whether they are in fact parodies.

A critical inquiry regarding this first fair use factor is whether the second work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. With respect to parody, the Supreme Court concluded:

> Parody has an obvious claim to transformative value, as Acuff–Rose itself does not deny. Like less ostensibly humorous forms of criticism, it can provide social benefit, by shedding light on an earlier work and, in the process, creating a new one... Thus, ... parody, like other comment or criticism, may claim fair use under § 107.

*Id.; see also Fisher v. Dees,* 794 F.2d 432 (9th Cir.1986) (finding a parody entitled "When Sonny Sniffs Glue" to be a fair use of the song, "When Sunny Gets Blue"); *Elsmere Music, Inc. v. National Broadcasting Co.,* 482 F.Supp. 741 (S.D.N.Y.), *aff'd,* 623 F.2d 252 (2d Cir.1980) (finding "I Love Sodom," a Saturday Night Live parody, to be a fair use of "I Love New York"). The Big Dog graphics therefore must alter WWE's intellectual property with new expression, meaning or message.

■ It is undisputed that in creating Big Dog's WBDF graphics, the artist used photographic references of WWE's wrestling characters. (WWE Exhibit B, p. 25: lines 18–25; p. 26: lines 1–2; p. 29: lines 5–21). Specifically, the artist would get a series of pictures of the wrestlers, generally from magazines, and using all the pictures as a reference, the artist would sketch caricatures of the wrestlers and scan them into the computer for further design. (*Id.*). Because the new work must reference the copyrighted material, a "[p]arody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or its collective victims') imagination ..." *Campbell,* 510 U.S. at 580–581, 114 S.Ct. 1164. Moreover, to qualify as a parody under the Supreme Court's definition, the newly cre-

ated work must comment upon or criticize the original copyrighted work.

WWE argues that the Big Dog graphics are not parodies because they do not comment on the original copied works. In response to WWE's interrogatories requesting Big Dog to identify and explain in detail the comment or criticism Big Dog contended was made by the WBDF merchandise, Big Dog responded with the following answer for each of the alleged infringing graphics: "Said product provides social commentary and humorous commentary on, and ridicule and poke fun at, the larger-than-life, intimidating, self-serious fierce and violent images and persona of WWF professional wrestling." (WWE Exhibit AA). WWE further argues that such answers act as a concession that Big Dog's WBDF merchandise makes no comment or criticism on the original works. In essence WWE contends that Big Dog admits its alleged parodic caricature of THE ROCK makes no comment specific to WWE's original works depicting THE ROCK and/or THE ROCK character itself; that Big Dog's alleged parodic caricature of STONE COLD STEVE AUSTIN makes no comment specific to WWE's original works depicting STONE COLD STEVE AUSTIN and/or the STONE COLD STEVE AUSTIN character itself; that Big Dog's alleged parodic caricature of the UNDERTAKER makes no comment specific to WWE's original works depicting the UNDERTAKER and/or the UNDERTAKER character itself; etc.

The Court finds WWE's interpretation of Big Dog's interrogatory responses unreasonably narrow, and its argument untenable. There is adequate deposition testimony from Big Dog indicating the nature of the commentary relative to the WBDF merchandise.[8] (*See e.g.* WWE Exhibit A, pp. 64–78; WWE Exhibit B, pp. 29–50; WWE Exhibit C, pp. 77–91). A visual examination of the graphics themselves is evidence of the humor, ridicule, and/or comment on the over-hyped world of professional wrestling. The graphics depict dogs in wrestling garb, with beards and goatees, one dog wearing an earring, with tattoos, wearing leather jackets and vests, wearing sunglasses, smashing each other with chairs, and in fact, wrestling. The WBDF merchandise can certainly be perceived as commenting, through mockery or derision, on "... the larger-than-life, intimidating, self-serious fierce and violent images and persona of WWF professional wrestling." In *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F.Supp.2d 410 (S.D.N.Y.2002), Hilfiger argued that the Nature Labs alleged parody regarding pet perfume made no comment about Hilfiger, and was therefore not entitled to First Amendment protection from Hilfiger's trademark infringement claim. *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F.Supp.2d at 415. Similarly, Hilfiger argued that the general partner of Nature Labs, John Harris, was unable to point to a specific comment about Hilfiger made by its products. The court stated that "[a]lthough Harris had difficulty expressing the parodic content of his communicative message, courts have explained that:

'Trademark parodies ... do convey a message. The message may be simply that business and product images need not always be taken too seriously; a trademark parody reminds us that we

---

8. In addition, Dwayne Johnson, the gentleman who portrays THE ROCK character, agreed that the Rock-weiler graphic pokes fun at his THE ROCK character. (Big Dog Exhibit M, p. 40: line 24; p. 41: lines 1–3).

WWE's chief marketing director, Julie Hoffman, agreed that the Bone Cold Steve Pawstin graphic mimics or pokes fun at the STONE COLD STEVE AUSTIN character. (Big Dog Exhibit Q, pp. 31–32).

are free to laugh at the images and associations linked with the mark. The message also may be a simple form of entertainment conveyed by juxtaposing the irreverent representation of the trademark with the idealized image created by the mark's owner.' "

*Id. citing L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 34 (1st Cir.1987); *see also Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 321 (4th Cir. 1992).

The threshold question when fair use is raised in defense of parody is whether the parodic character can be perceived. *Campbell,* 510 U.S. at 582, 114 S.Ct. 1164. While the Court has no comment on the quality of the humor, it can certainly perceive the WBDF merchandise as commenting on, or criticizing, the original works. Big Dog transforms the pseudo-ferocious nature of professional wrestling into a humorous "dog-fight." Moreover, there is no issue of fact regarding whether the WBDF merchandise refers to the original, or to whether the merchandise pokes fun at the original works. In addition, the sale of the parodic WBDF merchandise for their own sake is entitled to more indulgence that an original work used to advertise a product. *Campbell,* 510 U.S. at 585, 114 S.Ct. 1164. The Court will therefore weigh the first factor in favor of Big Dog.

(2) *The Nature of the Copyrighted Work*

The second statutory factor, "the nature of the copyrighted works," 17 U.S.C. § 107(2), recognizes that some works are closer to the core of intended copyright protection than others, and therefore fair use is more difficult to establish when those works are copied. *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. This Court certainly questions the originality and creativity of the WWE characters and storylines. The good guys against the bad

guys certainly precedes the establishment of professional wrestling, and regarding wrestling's "original" characters, THE ROCK followed "Hulk Hogan" who followed "the Macho Man" who followed "the Sheik" who followed "Andre the Giant," etc. We are not talking about the literary works of Victor Hugo. However, it is not disputed that WWE has spent time and effort on the development of its characters, storylines and persona, and the Court does not question its right to protection. Because "parodies almost invariably copy publicly known, expressive works," this factor provides little help in determining whether the parody is a fair use of the original. *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164, *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109, 115 (2d Cir. 1998), *Dr. Seuss Enterprises, L.P. v. Penguin Books,* 109 F.3d 1394, 1402 (9th Cir. 1997). Drawing all reasonable inferences from the facts in favor of WWE, the Court finds the second factor favors WWE, but only minimally.

(3) *The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole*

The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), are reasonable in relation to the purpose of the copying. As a general rule: "a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original." *Campbell,* 510 U.S. at 588–589, 114 S.Ct. 1164. The application of this guideline to parody, however, is particularly difficult. The Supreme Court has stated:

Parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through

distorted imitation. Its art lies in the tension between a known original and its parodic twin. When parody takes aim at a particular original work, the parody must be able to "conjure up" at least enough of that original to make the object of its critical wit recognizable. *Id.; see e.g. Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992)("We have consistently held that a parody entitles its creator under the fair use doctrine to more extensive use of the copied work than is ordinarily allowed . . . ."); *Elsmere Music, Inc. v. National Broadcasting Co.*, 623 F.2d 252 (2d Cir.1980)("An author is entitled to more extensive use of another's copyrighted work in creating a parody than in creating other fictional or dramatic works."); *Berlin v. E.C. Publics., Inc.*, 329 F.2d 541, 545 (2d Cir.1964) (holding that because defendants had taken no more of the original songs than was necessary to "recall or 'conjure up' the object of his satire" and because the parody had "neither the intent nor the effect of fulfilling the demand for the original," no infringement had taken place).

There is no dispute that Big Dog used actual photographs to copy the recognizable characteristics of THE ROCK, STONE COLD STEVE AUSTIN, and the UNDERTAKER. The question is whether Big Dog took more than was reasonably required to "conjure up" the characters and persona of WWE's professional wrestling. The Supreme Court instructs, however, that a parodist's copying of more than is necessary to conjure up the original will not necessarily tip the third factor against fair use. *Campbell*, 510 U.S. at 588, 114 S.Ct. 1164. Once Big Dog has taken enough to assure identification with the WWE property, the reasonableness of taking additional aspects of the original property depends on the extent to which the overriding purpose and character of

the WBDF merchandise is to parody the original, as well as "the likelihood that the parody may serve as a market substitute for the original." *Id., see also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d at 116. Based on the foregoing, even if Big Dog has "copied every recognizable characteristic" of the WWE characters, this third factor carries very little, if any, weight against fair use when the first and fourth factors favor the parodist. *See Leibovitz v. Paramount Pictures Corp.*, 137 F.3d at 116.

(4) *The Effect on the Potential Market for or Value of the Copyrighted Work*

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Because parody must be a transformative use, a parody is unlikely to serve as a market substitute for the original. *Campbell*, 510 U.S. at 592, 114 S.Ct. 1164 ("It is more likely that the new work will not affect the market for the original in any way cognizable under this factor, that is, by acting as a substitute for it (superseding its objects). This is so because the parody and the original usually serve different market functions.") (internal quotation marks and citations omitted).

Numerous courts have relied on this recognition that separate markets exist in concluding that a parody inflicted no harm on the market for a particular original. For example, in *Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir.1986), the court held that demand for the song, "When Sunny Gets Blue," a nostalgic reminiscence about lost love, was not supplanted by the parody "When Sonny Sniffs Glue," a song describing the physical aftermath of glue-sniffing. Similarly, in *Eveready Battery Co. v. Adolph Coors Co.*, 765 F.Supp. 440, 448 (N.D.Ill.1991), the district court held that a

beer commercial that parodied a battery commercial did not usurp the market for the first commercial. *See also Elsmere Music, Inc. v. National Broadcasting Co.,* 482 F.Supp. 741, 747 (S.D.N.Y.), *aff'd,* 623 F.2d 252 (2d Cir.1980) (finding that the song, "I Love Sodom," did not have an impermissible market effect on the demand for the song, "I Love New York.").

WWE argues that the WBDF merchandise circumvents the legal standards for licensing of its intellectual property and, therefore, substantially harms one of WWE's significant revenue streams.[9] WWE however is not entitled to a licensing fee for a work that otherwise qualifies for the fair use defense as a parody. *See Leibovitz v. Paramount Pictures Corp.,* 137 F.3d at 117. The Court finds the fourth factor in favor of Big Dog.

Based on the foregoing, it is not difficult to determine that the balance in this instance markedly favors Big Dog. The Court finds that the Big Dog's graphics are parodies of the WWE property, entitled to fair use under the statute. As such, Big Dog is entitled to summary judgment on WWE's copyright infringement claims set forth at Counts I through VI of the Amended Complaint.

**B.** *WWE's Claims Under the Lanham Act*

■ To prove unfair competition under Sections 32 or 43(a) of the Lanham Act, 15 U.S.C. § 1051 *et seq.,* WWE must prove that (1) it owns the mark in question; (2) the mark is valid and legally protectable; and (3) Big Dog's use of the mark to identify goods or services is likely to create confusion concerning their origin. *See*

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 279 (3d Cir.2001), *A & H Sportswear v. Victoria's Secret Stores,* 237 F.3d 198, 210 (3d Cir. 2000). Though Big Dog does not concede that WWE's alleged marks are valid and entitled to protection under the law, for the purpose of this Motion for Summary Judgment only, Big Dog asks the Court to assume that WWE has valid protectable rights in the trademarks, trade dress and rights of publicity alleged in the Amended Complaint. Because the first and second elements are undisputed, the questions herein involve the delineation and application of standards for the third factor, the evaluation of likelihood of confusion.

■ WWE argues that the WBDF merchandise creates a likelihood of confusion as to WWE's sponsorship or approval of the Big Dog merchandise. Big Dog essentially defends on two fronts: (1) the Big Dog graphics are parodies or some other form of expressive statements about the WWE and its wrestling characters and are protected under the First Amendment; and (2) Big Dog's parodies of WWE's alleged intellectual property are not likely to cause confusion in the marketplace. This Court has found herein that Big Dog's graphics are parodies, however, we cannot allow First Amendment principles to usurp Federal trademark law. In fact, trademark law permissibly regulates misleading commercial speech. *See Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F.Supp.2d at 415 (citations omitted).

■ Because Big Dog contends it is merely engaging in a parody of WWE's marks, mixed elements of traditional

---

**9.** WWE also contends that it is entitled to a presumption or inference of market harm because the WBDF merchandise is a nontransformative duplication of the original that was made for commercial purposes. In analyzing

the first factor of § 107, the Court found that the WBDF merchandise constituted parodies of the WWE intellectual property, and were transformative works.

trademark analysis and free speech policies are involved in the overall analysis. "In a traditional trademark infringement suit founded on the likelihood of confusion rationale, the claim of parody is not really a separate 'defense' as such, but merely a way of phrasing the traditional response that customers are not likely to be confused as to source, sponsorship or approval." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:153 (4th ed.2002). Parody, therefore, is not an affirmative defense, but only another factor to be considered in determining the likelihood of confusion.[10] Whether a customer is confused is the ultimate question. If Big Dog employs a successful parody, the customer would not be confused, but amused. *See Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir.1987). The keystone of parody is imitation, but must convey two simultaneous—and contradictory—messages:

> that it is the original, but also that it is not the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused.

*Nike, Inc. v. Just Did It Enters.,* 6 F.3d 1225, 1228 (7th Cir.1993) *quoting Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group,* 886 F.2d 490, 494 (2d Cir.1989). As a practical matter, we must simply ask whether a retail customer buying a t-shirt from Big Dog with the dog/wrestler caricatures and/or the WBDF logo or scratch logo design would likely believe that it is in some way related to,

connected or affiliated with, or sponsored by, WWE.

"To prove likelihood of confusion, plaintiffs must show that 'consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 280 (3d Cir.2001)*(quoting Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978)). The Third Circuit Court of Appeals devised a non-exhaustive list of ten factors, commonly known as the *"Lapp"* factors, to consider in determining whether there is a likelihood of confusion between marks. *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983). These factors are used to test for likelihood of confusion for goods that directly compete with each other, as well as for non-competing goods. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d at 215. The factors are:

(1) The degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the

---

**10.** The Second Circuit has recognized that where the unauthorized use of a trademark is part of an expressive work, such as a parody, the Lanham Act must be construed narrowly,

*Harley–Davidson, Inc. v. Grottanelli,* 164 F.3d 806, 813 n. 14 (2d Cir.1999) *(quoting* Restatement (Third) of Unfair Competition § 25 cmt. 1 (1995)).

same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of the functions; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

*Id.* at 215; *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 473 (3d Cir.1994); *Scott Paper Co.,* 589 F.2d at 1231. Application of the *Lapp* factors is a qualitative inquiry. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d at 215. The Court must utilize the appropriate factors relevant to the instant case, and may properly accord different weight to different factors depending on the particulars of the action. *Id.*

(1) *Similarity of the Marks*

The test for mark similarity is "whether the labels create the same overall impression when viewed separately." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d at 476 *quoting Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988). Courts must "compare the appearance, sound and meaning of the marks," *Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.,* 952 F.Supp. 1084, 1096 (D.N.J.1997), to determine whether the "average consumer, on encountering one mark in isolated circumstances of marketplace and having only [a] general recollection of the other, would likely confuse or associate the two." *Check-*

*point Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d at 281; *Fisons,* 30 F.3d at 477–78. When a parody is at issue however, "[i]f the difference in wording or appearance of the designation together with the context and overall setting is such as to convey to the ordinary viewer that this is a joke, not the real thing, then confusion as to source, sponsorship, affiliation or connection is unlikely." 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:155 (4th ed.2002).

There is no dispute that the graphics of the WBDF merchandise are similar to the WWE marks. That is inherent in the character and purpose of the Big Dog graphics. To be effective as a parody, the Big Dog graphics must convey that the caricatures are WWE wrestling characters, and that they are not the original characters. WWE argues that Big Dog uses several of its marks without alteration, such as the KNOW YOUR ROLE and WWF SMACKDOWN[11] marks, and the BRAHMA BULL and RATTLESNAKE design marks, and the remainder with little or "barely imperceptible" alterations, such as OPEN A CAN OF WHOOP ASS ( used as "Open a Can of Woof Ass"), BECAUSE STONE COLD SAID SO (used as "Because Bone Cold Said So"), AUSTIN 3:16 (used as "Pawstin 3:16"), JABRONI (used as "JaBONEi"), and the UNDERTAKER (used as the "Underdogger"). In addition, WWE contends that the marks are used in conjunction with other identifiers of WWE, including images and characters.

The Court, however, cannot look at the individual marks and design marks as they stand, but must consider the overall im-

---

11. This is inaccurate, the Big Dog's "Smackdown" graphic is has the phrase "WBDF SMACKDOWN" printed on the graphic, not "WWF SMACKDOWN." (Big Dog Exhibit K).

pression of the graphics. First let us examine Big Dog's "Bone Cold Steve Pawstin" graphic that is on the back of a t-shirt filed with the Court as Big Dog Exhibit L. The t-shirt contains the "Big Dog" trademark and dog design logo on the front left of the t-shirt, as well as on the neck label, with the graphic on the back of the t-shirt featuring a dog caricature of the STONE COLD STEVE AUSTIN character with the words " 'Bone Cold' Steve Pawstin" at the top of the graphic and the phrase "Open Up a Can of Woof Ass!" at the bottom. (Big Dog Exhibits L and K). The phrase is an obvious "dog" pun of Austin's "Open Up a Can of Whoop Ass!" phrase. Comparing the graphic to the images of STONE COLD STEVE AUSTIN at document nos. WWFE 01554 and WWFE 01569 of WWE Exhibit U, as well as with the photographs contained in WWE Exhibit O, it must be noted first that WWE's images are photographs, while Big Dog's caricature is an obvious sketch. In the WWE photographs of STONE COLD STEVE AUSTIN, Austin is in a variety of poses. The majority show him facing the camera wearing a black vest and a heavy gold chain. Austin has an earring in his left ear in some the pictures and no earring in others. The black vest he is wearing has the words "AUSTIN" vertically down the right side of the vest, an image of a skull on the upper left side, and lettering on the bottom left [12]. In the Big Dog graphic, Pawstin is a dog with floppy ears, a nose in the vague outline of a bull's head, a goatee and its hands, or modified paws, on its hips. Pawstin is facing forward with its head is cocked to the right showing more of the left side of its head and face. Pawstin is

wearing a black vest with the words "PAWSTIN" down the right side of the vest and a doggie skull, a skull featuring floppy ears and a nose similar to Pawstin's, on the left side of the vest. The doggie skull is surrounded by the words "BIG DOGS," and the skull itself has obvious differences from the one on AUSTIN's vest, as well as differences from the many SKULLS depicted in the WWE merchandise catalogs. (*See* WWE Exhibit U). Moreover, the coloring of the lettering is dissimilar. Austin is wearing a gold chain around his neck and in some of the photographs, a large ring on the ring finger of his right hand. Pawstin is also wearing a gold chain around its neck, but Pawstin's chain features an attached dog bone charm. Pawstin has an earring in its floppy left ear, and Pawstin is wearing a belt with "WBDF" on the buckle.

We can make a similar comparison of Big Dog's "Pawstin 3:16" graphic that is on the back of a t-shirt filed with the Court as Big Dog Exhibit L. The t-shirt contains the graphic on the back of the t-shirt again featuring STONE COLD STEVE AUSTIN depicted as a dog, and wearing blue jeans with a black t-shirt with the phrase "Pawstin 3:16" printed on the t-shirt. The figure also has a tail which is wrapped with a bandage. Below the figure are two rattlesnakes, each facing a skull that has dog ears, a dog tongue and a tire tread across the face [13]. On and among the snakes is the name "Bone Cold Steve Pawstin," and below the name is the phrase "Because Bone Cold Said Sol" (Big Dog Exhibits K and L). Again, there are many dissimilarities with the WWE's STEVE AUSTIN photographs. None of the photographs

---

12. On some vests the letters "S. O. B." appear to be printed, and on other vests the number "3" appears to be printed.

13. The tire tread was inserted as a humorous reference to a storyline that AUSTIN was not in the ring because he had been hit by a car. (WWE Exhibit B, p. 58: lines 4–11).

represent an exact model for the "Pawstin" graphic.

The written marks utilized by the parties are also very similar, with Big Dogs' phrases having obvious canine connotations; Big Dog using "Pawstin" for AUSTIN and the phrase "Woof Ass" as a humorous take on the phrase "Whoop Ass" used by WWE. The Big Dog phrase "Open Up a Can of Woof Ass!" is also an obvious play on Austin's allegedly popular "Because Stone Cold Said So!" There are also dissimilarities in the coloring and the typeface of the phrases. Further, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY."

As another example, the Court will examine Big Dog's "Rock-weiler" graphic that is on the back of a t-shirt filed with the Court as Big Dog Exhibit L. The t-shirt contains the "Big Dog" trademark and dog design logo on the front left of the t-shirt, as well as on the neck label, with the graphic on the back of the t-shirt featuring dog a caricature of THE ROCK, wearing sunglasses and a leather jacket with the name "The Rock-weiler" at the top of the graphic and the phrase "Know Your Role, Ja BONEi!" at the bottom of the graphic. (Big Dog Exhibits K and L). Further, at the bottom of the graphic are the words "BIG DOG SPORTSWEAR. THIS IS A PARODY." The Court could not find any pictures of THE ROCK in either WWE Exhibit O, WWE Exhibit U, or WWE Exhibit X that could have served as a precise model for Big Dog's Rock-weiler graphic. Therefore, the Court compared the Big Dog graphic to pictures of the Rock and associated phrases in the WWE catalogs (WWE Exhibt U), the video, (WWE Exhibt Y), and the included magazine pictures and articles. (WWE Exhibits O and X).

Again, the most obvious difference is that WWE's images of THE ROCK are photographs of Dwayne Johnson, while Big Dog's "Rock-weiler" graphic is a sketch of a dog caricatured as the WWE character. Again, the dominant portion of the "Rock-weiler" graphic, like all of Big Dog's graphics, is the fact that the image is a dog portraying a wrestler. The dog is wearing sunglasses and appears to be raising an eyebrow. WWE complains that the eyebrow is one of THE ROCK's facial expressions. It may be true, but it remains obvious that the Big Dog graphic is a dog, not THE ROCK.

WWE also complains that Big Dog used the BRAHMA BULL design mark without alteration. A review of WWE's exhibits however show a brahma bull in more than one style. There is a style that looks very similar to the image of the National Basketball Association's Chicago Bulls' emblem, and there is an outline of a bull that looks similar to the emblem of the University of Texas. Further, there are also caricatures of bulls, one of which is a caricature of THE ROCK with a head of a brahma bull. (WWE Exhibt U document no. WWFE 01560).

WWE also contends that Big Dog is using many of its trademark phrases with little or no alteration. As mentioned above, Big Dog uses obvious canine connotations in putting its own spin on the WWE's phrases. The Court of Appeals for the Seventh Circuit had to make a determination regarding the likelihood of confusion of similar marks on apparel in *Nike, Inc., supra.* In making a determination whether apparel with the word MIKE along with the familiar Nike "whoosh" emblem created confusion with consumers looking to buy "Nike" apparel with the "whoosh" emblem, the Seventh Circuit stated:

> After examining the size of the word MIKE and the mail-order form used for customer purchasing, we cannot con-

clude ... that as a matter of law the parody and trademark are so similar as to confuse the consumer. Yes, they are similar; but similarity alone does not end the inquiry. A jury could find that MIKE and NIKE, in text, meaning, and pronunciation, are not so similar as to confuse consumers, especially when making the decision to purchase or not to purchase.

*Nike, Inc. v. Just Did It Enters.*, 6 F.3d at 1230. The same is evident here. Is it possible for the phrases "JaBONEi" to be confused with "JABRONI," for "Bone Cold Steve Pawstin" to be confused with "STONE COLD STEVE AUSTIN," for the "Underdogger" to be confused with the "UNDERTAKER," or for "Pawstin 3:16" to be confused with "AUSTN 3:16"? Yes, it is certainly possible, especially when viewed from a distance. However, the difference in wording and appearance of the phrases together with the use of dogs as wrestling characters conveys to the ordinary consumer that this is an obvious joke.

Moreover, a consumer would certainly not confuse the block lettered "WBDF" with the block logo "WWF." Nor are the scratch lettered "WBDF" confusingly similar to WWE's scratch logo. The "WWF" scratch logo is very distinct, it is a large "W" with a smaller "W" tucked inside the larger "W" and the "F" is made up of the right wing of the "W" with two horizontal slashes across it to form the "F". This Court does not believe that a consumer would be confused when making a decision to purchase or not to purchase the goods of either party.

After a comparison of all Big Dog's graphics with the WWE property, the Court has come to similar conclusions. All of the names and phrasing used by Big Dog are modified to make obvious references to dogs. Viewed in their totality, Big Dog's graphics, though similar, are not sufficiently similar to WWE's in appearance, sound or meaning to create a likelihood of confusion. "[W]hile the similarity of the words used in the mark[s] would support an inference of likelihood of confusion, ... the striking dissimilarities in design outweigh any similarities." *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir.1987).

*(2) Strength of the Owner's Mark*

There is no dispute that WWE's marks are well known, well recognized and popular. Usually, such a strong mark would favor the plaintiff in a trademark case.[14] The general argument is that because WWE's marks are deeply implanted in the consumers' minds, it is more likely that Big Dog's marks will conjure up the image of WWE's products instead of Big Dogs'. *See, e.g., Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497, 503 (2d Cir.1996); *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir.1979); *MGM–Pathe Communications Co. v. Pink Panther Patrol*, 774 F.Supp. 869, 874 (S.D.N.Y. 1991). However, it is the strength of WWE's marks which make them objects of Big Dog's parodies.

Big Dog's parodic use, therefore, does not necessarily lead to confusion. In *Yankee Publishing Inc. v. News America Publishing Inc.*, 809 F.Supp. 267, 273 (S.D.N.Y.1992), the District Court stated "where the plaintiff's mark is being used as part of a jest or commentary ... [and] both plaintiff['s] and defendant's marks are

---

**14.** Under the Lanham Act, stronger marks are apt to receive greater protection. *See, e.g., Versa Prods. Co., Inc., v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 203 (3d Cir.1995)(observing that stronger marks carry greater recognition, and a similar mark is therefore more likely to cause confusion).

strong, well recognized, and clearly associated in the consumers' mind with a particular distinct ethic ... confusion is avoided ...." Obviously, Big Dog's mark has its own strength in the market place. They have been in business for several years, and have designed and sold a multitude of irreverent, humorous graphics over the years. (*See* Big Dog Facts ¶¶ 17, 21 and 22, Big Dog Exhibits J and R, and WWE Exhibits E, I and CC). The WBDF merchandise is simply another in a long line of Big Dog jokes. Moreover, this brand of humor has become associated with the Big Dog brand. Therefore, consumers of Big Dog's WBDF merchandise, all of which display the words "BIG DOG SPORTSWEAR. THIS IS A BARODY," are likely to see the graphics as the jokes they were intended.

Therefore, the clarity of Big Dog's parodic intent, and the widespread familiarity and strength of WWE's marks, weigh against the likelihood of confusion as to source or sponsorship between Big Dog's WBDF merchandise and WWE's intellectual property.

(3) *The Price of the Goods and Other Factors Indicative of the Care and Attention Expected of Consumers When Making a Purchase*

It is undisputed that goods at issue are relatively inexpensive, the most expensive being t-shirts selling for $19.95. (WWE Exhibits u and CC). Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations. *Versa Prods.*, 50 F.3d at 204 ("Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of the product, the more care that must be exercised in its selection.") Obviously, the price levels are

important in determining the amount of care the reasonably prudent buyer will use. "If the goods or services are relatively expensive, more care is taken and buyers are less likely to be confused as to source or affiliation." 5 MCCARTHY ON TRADEMARKS, § 23:95; *see also Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206–07 (1st Cir.1983) (expensive health care equipment elevated concern of purchasers).

Similarly, where the relevant buyer class is composed solely of professional, or commercial purchasers:

[I]t is reasonable to set a higher standard of care than exists for consumers. Many cases state that where the relevant buyer class is composed of professionals or commercial buyers familiar with the field, they are sophisticated enough not to be confused by trademarks that are closely similar. That is, it is assumed that such professional buyers are less likely to be confused than the ordinary consumer.

3 MCCARTHY ON TRADEMARKS, § 23:101; *see also Ford Motor Co.*, 930 F.2d at 293 ("Professional buyers, or consumers of very expensive goods, will be held to a higher standard of care."); *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 128 (4th Cir.1990) ("In a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone."); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173–74 (5th Cir.1986) (business purchasers of expensive products not likely to confuse goods with similar marks).

Though WWE admits its fans are extremely knowledgeable about the story-lines and personalities of the WWE wrestling characters (Big Dog Facts ¶ 41), the Court cannot classify them as "sophisticat-

ed" purchasers.[15] At best, the purchasing class may be classified as mixed. In that case, the Third Circuit would not hold the general class to a high standard of care. *Ford Motor Co.*, 930 F.2d at 293 ("When the buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class."). Though it seems highly unlikely, it is not inconceivable that a WWE fan would confuse WBDF merchandise as affiliated with WWE. Although the fan would have to wander into a Big Dog retail establishment or the Big Dog internet site to come across the merchandise. The third *Lapp* factor will therefore be weighed in favor of WWE.

### (4) and (6) *The Length of Time the Mark was Used Without Evidence of Actual Confusion, and Evidence of Actual Confusion*

Evidence of actual confusion is not required to prove likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d at 291 *citing Versa Prods.*, 50 F.3d at 205; *Fisons*, 30 F.3d at 476 ("While evidence of actual confusion would strengthen plaintiff's case, it is not essential."). The Third Circuit recognizes the difficulty in finding evidence of actual confusion, therefore, any evidence of actual confusion is highly probative of the likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d at 291; *see also Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 612 (7th Cir.1965) ("Since reliable evidence of actual confusion is dif-

ficult to obtain in trademark and unfair competition cases, any such evidence is substantial evidence of likelihood of confusion.").

However, evidence of "isolated" or "idiosyncratic" incidents of actual confusion need not be given much weight; "ownership of a trademark does not guarantee total absence of confusion in the marketplace." *A & H Sportswear v. Victoria's Secret Stores*, 237 F.3d at 227 (*quoting Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir.1978)). Further, the Third Circuit allows that if Big Dog's WBDF merchandise has been sold for an appreciable period of time without evidence of actual confusion, "... one can infer that continued marketing will not lead to consumer confusion in the future. The longer the challenged product has been in use, the stronger this inference will be." *Id. quoting Versa Prods.*, 50 F.3d at 205.

■ The parties herein agree that there is no evidence of actual confusion. It is also undisputed that WWE was not aware of the WBDF merchandise for several years after it was introduced into the marketplace. WWE's Vice President of Consumer products, Donna Goldsmith, WWE's Chief Marketing Officer, Julie Hoffman, and THE ROCK, Dwayne Johnson, had not seen any of the WBDF merchandise until their depositions in November and December of 2001. (Big Dog Facts ¶¶ 45 and 47). Tellingly, in the places a consumer has to look to purchase Big Dog merchandise, the consumer would find the WBDF merchandise alongside

---

**15.** By WWE's own admission however, its "typical viewer is a computer-savvy, college-educated professional ..."
- A majority of its adult viewers (64%) have attended college.
- The average household income of a typical viewer is over $50,000.
- A majority of its viewers (54%) consider themselves "Professionals" or "White Collar." They own more than one computer, and 77% have access to the internet.
- The average household owns two cars.

(WWE Exhibit R, p. 12).

other Big Dog merchandise which parody several other popular entities, including celebrities, sports figures, movies, etc. Not only does this alert the consumer that the WBDF merchandise is a lampoon, but it is also strong evidence adverse to a likelihood of confusion. Therefore, because there is no evidence of actual confusion, and based upon the permitted inference regarding Big Dog's marketing of the WBDF merchandise for a considerable period of time without confusion, the Court will weight this factor in Big Dog's favor.[16]

### (5) Big Dog's Intent in Adopting the Mark

The "intent" inquiry in a *"Lapp"* analysis is only relevant to the extent it bears on the likelihood of confusion. *A & H Sportswear v. Victoria's Secret Stores,* 237 F.3d at 225. The Third Circuit has held that "a defendant's intent to copy, without more, is not sufficiently probative of the defendant's success in causing confusion to weigh such a finding in the plaintiff's favor; rather defendant's intent will indicate a likelihood of confusion if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior." *Id.* at 225–226. Moreover, the weight of this factor is somewhat diminished in the context of parody as all parodists of consumer products "intend to select" the products' mark to make their comments. *Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1151 (C.D.Cal.1998) *aff'd* 296 F.3d 894 (9th Cir.2002); *see also, Jordache Enterprises,* 828 F.2d at 1486; *Cliffs Notes, Inc. v.*

*Bantam Doubleday Dell Publishing Group,* 886 F.2d at 494 (recognizing the need to balance First Amendment interests against likelihood of confusion, in part because it "allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent").

The record is replete with evidence of Big Dog's intent to parody the WWE. Further, each of Big Dog's graphics contain the Big Dog trademark and/or its famous dog design logo, as well as the disclaimer "THIS IS A PARODY." Based on the foregoing, the Court must weigh factor (5) in favor of Big Dog.

### (7) Whether the Goods are Marketed Through the Same Channels of Trade

Courts have recognized that "the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d at 288 *quoting Acxiom Corp. v. Axiom, Inc.,* 27 F.Supp.2d 478, 502 (D.Del. 1998). Applying this factor, courts must examine the manner in which the parties market and sell their products.

It is undisputed that WWE merchandise and Big Dog merchandise are sold through separate and distinct channels. WWE merchandise is sold at the venues of its live shows, through its own website and catalog, and through selective licensees

---

16. The Court is aware that WWE is not legally required to conduct a confusion survey. Such a failure, particularly when the trademark owner is financially able, justifies an inference "that the plaintiff believes the results of the survey will be unfavorable." *Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 475 (3d Cir.1990); *see also Eagle Snacks, Inc. v. Nabisco Brands,* *Inc.,* 625 F.Supp. 571, 583 (D.N.J.1985); *Tyco Indus., Inc. v. Lego Sys. Inc.,* 1987 WL 44363, 1987 U.S. Dist. LEXIS 13193 (D.N.J.1987), *aff'd,* 853 F.2d 921 (3d Cir.1988). But under the circumstances of this case, and drawing all reasonable inferences from the facts in a light favorable to WWE, WWE's failure to conduct a confusion survey was not weighed against it in this instance.

who place the merchandise in retail stores such as K–Mart, Costco, Wal–Mart and Target. (Big Dog Fact ¶ 8). More importantly, WWE gets extremely broad exposure to its products through its television and pay-per-view programming, and its live arena events. (WWE Additional Material Facts ¶¶ 56 and 61). WWE is the number one pay-per-view provider in the world with thirty-four (34) million viewers in 2001. (WWE Exhibit R, p. 9). In 2001, WWE held two hundred twelve (212) live events in one hundred (100) cities throughout the United States, Canada and England. These live events were held in forty-seven (47) of the top fifty (50) media markets. (WWE Exhibit R, p. 11). WWE publishes two (2) monthly magazines, "World Wrestling Entertainment Magazine" and "Raw Magazine," that total over five (5) million readers combined. (WWE Exhibit R, p. 10). In addition, its characters have been featured in several other magazines and on non-WWE television programs. (WWE Exhibits R, X and Y). There is no evidence in this case that Big Dog has this type of exposure.

Big Dog sells its WBDF merchandise only in its Big Dog retail stores, and through its website and catalog. Each outlet only sells Big Dog merchandise. (Big Dog Fact ¶ 19). One would not wander into a Wal–Mart and find WBDF merchandise right next to WWE merchandise. Therefore, a consumer must make a choice to visit a Big Dog retail, store, go to its website, or order through the Big Dog catalog to purchase WBDF merchandise. Based upon the separate and distinct channels of trade and the disparate marketing exposure, this factor must be weighed against a likelihood of confusion.

**(8)** *The Extent to Which the Targets of the Parties' Sales Efforts are the Same*

WWE argues that the same consumer market is targeted by both WWE and Big Dog. The Third Circuit has recognized that when parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d at 289. It is undisputed that the "attitude" and "humor" of both WWE's merchandise and Big Dog's merchandise are important aspects of their respective markets. It is also not disputed that the products of both parties' products are irreverent to certain societal postures. Though WWE's irreverence and humor are somewhat base and crude [17] when compared to Big Dog's, it is not inconceivable that the same consumer market is targeted. Though the products are not marketed through the same channels of trade, and though there is no evidence they are advertised in the same manner, drawing all reasonable inferences from the facts in a light favorable to WWE, the Court will weigh this factor in favor of WWE.

**(9)** *The Relationship of the Goods in the Minds of Consumers Because of the Similarity of the Functions*

When the relevant goods are similar, there is a likelihood that consumers will assume an affiliation or common source between the products. *See Checkpoint,* 269 F.3d at 287. Nevertheless, when two products serve different functions and are part of distinct sectors or niche markets within a broader product category, they

---

**17.** The Court is certainly not attempting to pass judgment or comment on the morality of WWE's products, but the phrases on its graphics are violent, confrontational, exhibit an "in your face" attitude, and many are rife

with sexual innuendo. In addition, WWE sells images and videos of semi-nude women. (WWE Exhibit U). Big Dog's products exhibit dog-related humor. The "attitudes" are really quite diverse.

might be sufficiently unrelated to each other that consumer confusion is less likely. *Id.* at 287–88. Under this prong, courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship. *Fisons*, 30 F.3d at 481 ("The question is whether the consumer might ... reasonably conclude that one company would offer both of these related products."). The test is whether the goods are similar enough that a customer would assume they were offered by the same source. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d at 286 *citing Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir.1988).

This Court has already found that, though similarities exist, Big Dog's graphics are not sufficiently similar to WWE's in appearance, sound or meaning to create a likelihood of confusion.[18] Moreover, based upon the product dissimilarities, the different channels of trade, as well as the extreme disparity in market exposure, this factor is weighed in favor of Big Dog.

### (10) *Evidence of Converging Markets*

Under this factor, the Court looks not only to evidence that a plaintiff has actually moved into the defendant's market, but also to "other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that it is likely to expand into that market." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d at 290 *quoting Interpace*

Corp. v. Lapp, Inc.*, 721 F.2d at 463. There is no evidence in this action that the parties' markets are converging. As such this factor must be weighed against a likelihood of confusion.

### *Totality of the Lapp Factors*

██ Big Dog's humorous word play and the "dogifying" of the WWE wrestling characters, used in conjunction with its registered trademark, dog design logo, and disclaimer "THIS IS A PARODY," clearly indicate to the consumer that the WBDF merchandise is a broad spoof of WWE, its characters and attitudes. Certainly, there are similarities, and there must be in order to conjure up thoughts of the original, while clearly not being the original. Moreover, there is no evidence in this action of actual confusion, nor does the Court find a likelihood of confusion in the marketplace between the WWE and WBDF merchandise. Big Dog's graphics spoofing the WWE wrestling characters and phrases are parodies that entitle its WBDF merchandise to First Amendment protection when analyzing the *Lapp* factors. Evaluating the *Lapp* factors, while applying First Amendment principles to Big Dog's parodies of WWE, the Court finds that the factors favor Big Dog and that there is no likelihood of confusion

### C. *Dilution of the WWE Marks*

██ The Federal Trademark Dilution Act of 1995[19] grants protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion, if

---

**18.** The Court finds this to be so not only at the point of sale, but also with regard to post-sale confusion.

**19.** The Act provides:
The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.
15 U.S.C. § 1125(c)(1).

the defendant's use diminishes or dilutes the strong identification value associated with the plaintiff's mark. *See* 4 McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24.70. The dilution doctrine is founded upon the premise that a gradual diminution of the value of a famous trademark, resulting from an unauthorized use, constitutes an invasion of the senior user's property rights and/or good will in its mark and gives rise to an independent wrong. *Id.*

■ To establish a claim for relief under the federal dilution act, WWE must plead and prove: (1) it is the owner of a mark that qualifies as famous; (2) Big Dog is making commercial use in interstate commerce of the mark or trade name; (3) Big Dog's use began after the WWE's marks became famous; and (4) Big Dog's use causes dilution by lessening the capacity of WWE's marks to identify and distinguish goods or services. *See Times Mirror Magazines Inc. v. Las Vegas Sports News*, 212 F.3d 157, 163 (3d Cir.2000); *see also Hershey Foods Corp. v. Mars, Inc.*, 998 F.Supp. 500, 504 (M.D.Pa.1998) (*quoting* 4 McCARTHY, *supra*). For the purpose of this Motion, Big Dog asks that the Court assume that the WWE marks are famous. Additionally, there are no disputes regarding either Big Dog's use in interstate commerce, or that Big Dog's use of the marks began after WWE's use. The only element at issue here is whether Big Dog's use lessens the distinctiveness of WWE's marks.

■ Dilution may occur by "blurring" or "tarnishing" the mark. Dilution by blurring occurs when the use of the defendant's mark results in the loss of the ability for plaintiff's mark to serve as a unique identifier of the plaintiff's product, causing the public to no longer associate the plaintiff's famous mark with its goods or services. *Times Mirror*, 212 F.3d at 168.

Moreover, the defendant's use of the mark causes the identifying features of plaintiff's mark to become vague and less distinctive. *Id.* Though the Third Circuit in *Times Mirror* set forth a six (6) factor test to determine whether use of a mark has caused blurring, 212 F.3d at 168, the Court finds the dilution analyses in cases involving parody more instructive. *See e.g., Hormel Foods Corp. v. Jim Henson Prods., supra.; Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., supra.; Tetley, Inc. v. Topps Chewing Gum, Inc.*, 556 F.Supp. 785 (E.D.N.Y.1983).

. In *Jordache,* the court found that "because of the parody aspect of Lardashe, it is not likely that public identification of JORDACHE with the plaintiff will be eroded; indeed, parody tends to increase public identification of a plaintiff's mark with the plaintiff." *See Jordache Enterprises*, 828 F.2d at 1490 (quoting *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 625 F.Supp. 48, 57 (D.N.M.1985)). The court further found that "under all the circumstances, the continued existence of LARDASHE jeans simply will not cause JORDACHE to lose its distinctiveness as a strong trademark for jeans and other apparel." *Id.* In *Hormel Foods Corp. v. Jim Henson Prods.,* the court found that Henson's obvious parody was similar to the "Tetley Flea Bag" stickers Tetley sought to enjoin in *Tetley, Inc. v. Topps Chewing Gum, Inc., supra.,* where "the broad humor ... employed served to prevent the type of blurring which might result from a more subtle or insidious effort at humor at plaintiff's expense." *Hormel Foods Corp. v. Jim Henson Prods.,* 73 F.3d at 506, *quoting Tetley, Inc. v. Topps Chewing Gum, Inc.,* 556 F.Supp. at 794, As in these cases involving spoofs, Big Dog's parody is more apt to "increase public identification" of WWE's marks with WWE. *See Hormel Foods Corp. v. Jim Henson Prods.,* 73

F.3d at 506; *Jordache Enterprises*, 828 F.2d at 1490.

■ As a practical matter, however, it is undisputed that WWE is an integrated media and entertainment company engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events, and the licensing and sale of branded consumer products. (Am. Cmplnt. ¶¶ 11 and 16) WWE has been involved in the sports entertainment business for over twenty (20) years and has developed story lines based around its wrestling characters. (Am. Cmplnt. ¶¶ 17 and 18) Currently, WWE produces five television programs each week: (I) "Raw" and "War Zone" shown consecutively on Monday nights and known as "Raw is War"; (ii) "WWF Smackdown!" on Thursday nights; (iii) "Live Wire" on Saturday mornings; (iv) "Superstars" on Sunday mornings; and (v) "Heat" on Sunday nights. (Am.Cmplnt.¶ 17). It is undisputed that WWE's programming, live shows and characters are extremely popular and successful.

In addition to the WWE's television exposure, its characters have appeared or been featured on numerous television shows including: The Tonight Show with Jay Leno; Live! With Regis and Kathie Lee; Late Late Show with Craig Kilborn; Late Night with Conan O'Brian; Inside Edition; Rikki Lake; Billboard Music Awards; Fox News Live; E! News Daily; Access Hollywood; MTV; and Saturday Night Live. (WWE Exhibit Y). Moreover, there is a huge disparity in marketing exposure as discussed above. (*See* WWE Exhibit R). It is therefore inconceivable to this Court that a jury could find that Big Dog's eight (8) graphic designs of dogs

caricatured as wrestling characters cause or will cause the public to no longer associate WWE's famous marks with its goods or services.

■ WWE also argues that the WBDF merchandise tarnishes its marks by using them in a manner that is inconsistent, or out-of-keeping, with WWE's image. *See Jordache Enterprises*, 828 F.2d at 1490.[20] WWE argues that tarnishment has occurred here because Big Dog has used WWE's marks in ways that are "wholly inconsistent" with WWE's carefully developed portrayal of its characters and marks.

■ WWE's argument is unavailing. Tarnishment occurs when the effect of defendant's use of a mark is to dilute by tarnishing or degrading positive associations of the mark and diluting the distinctive quality of the mark, 4 McCarthy on Trademarks and Unfair Competition § 24.95. In *Hormel Foods,* the Second Circuit observed that the *sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use. *Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d at 506. A mark is tarnished, therefore, when it is improperly associated with an *inferior* or *offensive* product or service as a result of the junior user's mark, "presenting a danger that consumers will form unfavorable associations with the mark." *Strick Corp. v. Strickland*, 162 F.Supp.2d 372, 378 n. 10 (E.D.Pa.2001) (*quoting Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 881 (9th Cir.1999))(emphasis added).

There is no evidence here that Big Dog's WBDF merchandise is either inferior or offensive. The most offensive phrase used by Big Dog is "Open Up a Can of Woof

**20.** In *Jordache,* however, the plaintiff was referring to the quality of plaintiff's product, i.e. its product was tarnished because of the alleged disparity in quality between Lardashe jeans and Jordache jeans. *See Jordache Enterprises,* 828 F.2d at 1490.

Ass" which is a take-off on WWE's phrase "Open Up a Can of Whoop Ass." Many of WWE's t-shirt graphics contain phrases that are profane, violent or carry sexual connotations, such as: "hey wuss-boy"; "after I beat you, I'm gonna take your girlfriend"; "KILL 'EM ALL! LET STONE COLD SORT 'EM OUT"; "Got Head?"; "Venis Envy"; "POONTANG PIE"; "If you can't beat it ...SUCK IT"; "Other Side JACKASS"; "TESTICULAR FORTITUDE"; "Sexual Chocolate;" "SUCK IT"; and "AMERICAN BADASS." (WWE Exhibit U, Big Dog Exhibit C). Also found in WWE's catalog are pictures, posters, calendars and videos of semi-nude women. (WWE Exhibit U, Big Dog Exhibit C). Big Dog graphics, on the other hand are humorous and generally appropriate for the entire family, and unlikely to create in the mind of consumers a particularly unwholesome, unsavory, or degrading association with WWE's name or marks.

 Considering that tarnishment caused merely by an editorial or artistic parody which satirizes plaintiff's product or its image carries the free speech protections of the First Amendment,[21] *see* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24.105, it is difficult for the Court to find that WWE's marks have been diluted in any way. Moreover, the Supreme Court recently stated "... where the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution." *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003). Based upon the foregoing, Big Dog will be granted summary judgment on WWE's trademark dilution claim under Section 43(c) of the Lanham Act. Regarding WWE's dilution claim under Pennsylvania law, the wording for the anti-dilution provisions of the Pennsylvania statutes, 54 PA. CONS. STAT. ANN. § 1124, is taken almost verbatim from the anti-dilution provision in the United States Code. Accordingly, there is no appreciable difference in the applicable standard. *See Strick Corp. v. Strickland*, 162 F.Supp.2d 372, 378 n. 10 (E.D.Pa.2001).

## D. *WWE's Right of Publicity Claims*

At Counts XV, XVI and XVII of its Amended Complaint, WWE claims violations of the common law publicity rights on behalf of Dwayne Johnson, who portrays THE ROCK, Steve Williams, who portrays STONE COLD STEVE AUSTIN, and Mark Calloway, who portrays the UNDERTAKER.

 Pennsylvania recognizes the common law right of publicity, which grants a person an "exclusive right to control the commercial value of his name and likeness and to prevent others from exploiting that value without permission." *Brockum Co. v. Blaylock*, 729 F.Supp. 438, 445 (E.D.Pa. 1990) (citation omitted); *Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc.*, 627 F.Supp. 856, 862 (E.D.Pa.1985) ("Pennsylvania has recognized the right of publicity ...."); *Vogel v. W.T. Grant Co.*, 458 Pa. 124, 327 A.2d 133, 136 (1974).

A defendant violates a plaintiff's right of publicity by "appropriating its valuable name or likeness, without authorization, [and using] it to defendant's commercial advantage." *Philadelphia Orchestra Ass'n v. Walt Disney Co.*, 821 F.Supp. 341,

---

**21.** The Restatement takes the position that an anti-dilution statute is not available against unauthorized trademark uses which "comment on, criticize, ridicule, parody or disparage" the goods or business of the trademark owner. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 25(2)(1995).

349 (E.D.Pa.1993); *see also Seale v. Gramercy Pictures,* 964 F.Supp. 918, 929–30 (E.D.Pa.1997)(finding no Pennsylvania case law clearly setting forth the elements for a right of publicity claims and predicting that the Pennsylvania Supreme Court will clarify the law by adopting the RESTATEMENT (THIRD) OF UNFAIR COMPETITION). Section 46 of the Restatement defines the right of publicity as follows:

> One who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for the purposes of trade [22] is subject to liability for the relief appropriate under the rules stated in §§ 48 and 49.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 46.

■ The right of publicity is often invoked in the context of commercial speech when the appropriation of a celebrity likeness creates a false and misleading impression that the celebrity is endorsing a product. *See Waits v. Frito–Lay, Inc.* 978 F.2d 1093 (9th Cir.1992); *Midler v. Ford Motor Co.* 849 F.2d 460 (9th Cir.1988). In addressing right of publicity claims, however, courts have been mindful that the First Amendment provides greater protection to works of artistic expression than it provides to pure "commercial" speech. *Seale v. Gramercy Pictures,* 949 F.Supp. 331, 337 (E.D.Pa.1996). In *Cardtoons, L.C. v. Major League Baseball Players Assoc.,* 95 F.3d 959 (10th Cir.1996), the Tenth Circuit held that the First Amendment guarantee of freedom of expression outweighs the rights of publicity of professional baseball players where a trading card producer sold "parody trading cards" containing cartoons of well-known baseball players. Recognizing that the parody cards "are not commercial speech—they do not merely advertise another unrelated product," the Court held that the parody cards "are an important form of entertainment and social commentary that deserve First Amendment protection." *Cardtoons, L.C. v. Major League Baseball Players Assoc.,* 95 F.3d at 970, 976, *see also Seale v. Gramercy Pictures,* 949 F.Supp. at 337.

In *Comedy III Productions, Inc. v. Gary Saderup, Inc.,* 25 Cal.4th 387, 106 Cal.Rptr.2d 126, 21 P.3d 797 (2001), the California Supreme Court found that sketched portraits of The Three Stooges that were sold individually and on t-shirts were expressive works and not an advertisement for, or endorsement of, a product. Though the works were done for financial gain, the court held that the defendant's works did not lose First Amendment protection because they were produced for profit. *Comedy III Productions, Inc. v. Gary Saderup, Inc.,* 106 Cal.Rptr.2d 126, 21 P.3d at 802. More importantly, the court in *Comedy III* found that because of the importance celebrities hold in our society [23], the right of publicity can potentially

---

**22.** The Restatement defines the term "for the purposes of trade" as follows:

> The name, likeness, and other indicia of a person's identity are used "for the purposes of trade" under the rule stated in § 46 if they are used in advertising the user's goods or services, or are placed on merchandise marketed by the user, or are used in connection with services rendered by the user....

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 47.

**23.** As one commentator stated: "Entertainment and sports celebrities are the leading players in our Public Drama. We tell tales, both tall and cautionary, about them. We monitor their comings and goings, their missteps and heartbreaks. We copy their mannerisms, their styles, their modes of conversation and of consumption. Whether or not celebrities are 'the chief agents of moral change in the United States,' they certainly are widely used—far more than are institutionally anchored elites—to symbolize individ-

chill alternative versions of celebrity images that are "iconoclastic, irreverent, or otherwise attempt to redefine celebrity meaning."*Id.*, 106 Cal.Rptr.2d 126, 21 P.3d at 803. Such prominence invites comment, and the right to publicity should not be used as a shield to caricature, parody and satire. *Id.*

There is an obvious tension between forms of artistic expression protected by the First Amendment and those that must give way to a celebrity's right of publicity. The California Supreme Court found copyright analysis to be instructive, using the first fair use factor, "the purpose and character of the use" 17 U.S.C. § 107(1), in reconciling these countervailing rights. *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 106 Cal.Rptr.2d 126, 21 P.3d at 808. Whether a work is "transformative" or merely supersedes the objects of the original creation, therefore, is crucial to this Court's attempt at reconciling the right of publicity with the First Amendment.

■■■ As this Court has set forth in detail above, the WBDF merchandise parodies the characters and persona of the WWE. The graphics are not literal depictions, as the California Supreme Court found in *Comedy III*, but caricatures of WWE's wrestling characters. Big Dog's use of dogs to poke fun at celebrities and societal icons is an important form of entertainment and expressive commentary that deserves First Amendment protection. There is by no means a direct trespass or rip-off of the WWE wrestling characters, Big Dog has added significant artistic and imaginative expression to its graphics that outweighs the state law in-

terest in protecting WWE's rights of publicity. Moreover, the celebrity status of the high profile of the WWE characters, which the WWE admits and Big Dog does not dispute, make them prime targets of satire and parody. Finding no issue of material fact, this Court finds that Big Dog is entitled to judgment as a matter of law on WWE's claims for violation of the common law publicity rights of Dwayne Johnson, Steve Williams, and Mark Calloway.

### E. *WWE's Remaining Claims*

■■■ WWE also presents claims for false designation of origin, misappropriation and unfair competition under Section 43(a) of the Lanham Act. (Counts VIII and X of the Amended Complaint). Under Section 43(a), unfair competition occurs where, *inter alia*, a defendant uses a false designation of origin, or misappropriates the goodwill of another, in connection with goods or services in interstate commerce that will likely cause confusion in the marketplace and likely cause the plaintiff injury. *See* 15 U.S.C. § 1125(a)(1). Federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d at 210. To prove either form of the Lanham Act violation, WWE must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) Big Dog's use of the mark to identify goods or services causes a likelihood of confusion. *See id.; Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir.2000).

ual aspirations, group identities, and cultural values. Their images are thus important expressive and communicative resources: the peculiar, yet familiar idiom in which we conduct a fair portion of our cultural business

and everyday conversation." Madow, *Private Ownership of Public Image: Popular Culture and Publicity Rights* 81 CAL. L. REV. 125, 128 (1993)(fns. omitted).

446

■ The Court conducted a detailed analysis of these factors in finding that Big Dog's graphics and its WBDF merchandise do not infringe upon WWE's trademarks. Therefore, it follows that Big Dog must prevail on WWE's claims for false designation of origin, misappropriation and unfair competition. Moreover, the Third Circuit test for common law infringement and unfair competition is identical to the test for federal infringement and unfair competition. *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F.Supp.2d 335, 386 (D.N.J. 2002), *Apollo Distrib. v. Jerry Kurtz Carpet Co.*, 696 F.Supp. 140, 143 (D.N.J.1988). WWE's claim of unfair competition under the common law of Pennsylvania (Count XIV) also fails.

■ Finally, WWE seeks relief for violation of Pennsylvania's fair trade practice statutes. 73 PA. CONS. STAT. ANN. §§ 201–2 and 201–3. Under Section 201–9.2, a private cause of action under the statute is available only to consumers who have purchased or leased goods or services for personal, family, or household purposes. *See Weinberg v. Sun Co.*, 565 Pa. 612, 777 A.2d 442, 445–446 (2001). The statute does not provide a private cause of action for the alleged violation of the unfair competition portion of the statute. *See Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 320 n. 3 (3d Cir.1995). Because WWE does not bring this claim as a consumer[24], and fails to allege that it purchased or leased Big Dog's WBDF merchandise as a result of the allegedly unfair trade practice, it has no standing to bring an action for unfair competition pursuant to Section 201–3. Big Dog is entitled to Summary Judgment on WWE's claim for violation of Pennsylvania's fair trade practice statutes.

V. CONCLUSION

Based upon the foregoing, this Court finds that the Big Dog WBDF merchandise parodies WWE's widely popular characters and phrases, and therefore, the property is entitled to the free expression protections of the First Amendment. Moreover, Big Dog's merchandise has the intention and effect to amuse rather than confuse the public, and this Court is unable to find a likelihood of consumer confusion. Big Dog's parodies convey a simple message that business and product images need not always be taken too seriously, and we are reminded that we are free to laugh at the images and associations linked with these icons. Denying Big Dog the opportunity to poke fun at WWE characters and symbols that have become such a major component in today's entertainment media, would constitute a serious curtailment of a protected form of expression. As such, Big Dog's motion for summary judgment shall be granted. An appropriate order will follow.

ORDER OF COURT

AND NOW, this 10th day of March, 2003, upon consideration of Defendant's Motion for Summary Judgment and Plaintiff's Response thereto, together with the briefs, exhibits and appendices filed therewith,

IT IS HEREBY ORDERED, that the Motion for Summary Judgment filed on behalf of Defendant, Big Dog Holdings, Inc., (**Document No. 25**) is **GRANTED.** Judgment is hereby entered for Defen-

24. The statute protects business competitors from unfair competition by authorizing the Attorney General and district attorneys to bring actions in the name of the Commonwealth of Pennsylvania against people they have reason to believe are "using or about to use any method, act, or practice declared by . . . this act to be unlawful." 73 PA. CONS. STAT. ANN. §§ 201–4.

dant, Big Dog Holdings, Inc., and against Plaintiff, Worldwide Wrestling Federation Entertainment, Inc.